In re Marlyn Verle DAHLQUIST,
Debtor.

FIRST NATIONAL BANK IN SIOUX
CITY, IOWA, Plaintiff,

v.

Marlyn Verle DAHLQUIST, Defendant.

In re Robert Dean DAHLQUIST, Debtor.

FIRST NATIONAL BANK IN SIOUX
CITY, IOWA, Plaintiff,

v.

Robert Dean DAHLQUIST, Defendant.

In re James Marlyn DAHLQUIST,
Debtor.

FIRST NATIONAL BANK IN SIOUX
CITY, IOWA, Plaintiff,

v.

James Marlyn DAHLQUIST, Defendant.

Bankruptcy Nos. 483–00230,
483–00238 and 483–00239.

Adv. Nos. 483–0209, 483–0217, 483–0218.

United States Bankruptcy Court,
D. South Dakota.

Oct. 21, 1983.

478

F. Joseph Du Bray & George F. Madsen, Shull, Marshall & Marks, Sioux City, Iowa, Edward J. Leahy, May, Johnson, Doyle & Becker, P.C., Sioux Falls, S.D., for plaintiff.

John E. Harmelink, John R. Kabeiseman, Yankton, S.D., for defendant.

## THE FACTS, ISSUES, AND ALLEGATIONS

PEDER K. ECKER, Bankruptcy Judge.

The debtors in these consolidated cases are farmers/ranchers doing business in Nebraska and South Dakota. Marlyn Verle Dahlquist filed his petition for Chapter 11 relief on July 5, 1983. *See* 11 U.S.C.A. § 1101 *et seq.* (1979). Three days later, Marlyn's sons, James Marlyn Dahlquist and Robert Dean Dahlquist, also filed petitions under Chapter 11 of the Bankruptcy Code. Marlyn, James, and Robert Dahlquist will hereinafter be collectively referred to as "debtors."

The debtors reside on a farm near Laurel, Nebraska, where they jointly manage a large livestock and farming operation. The debtors' various personal property assets are freely comingled. In addition to land and personal property in Nebraska, the debtors lease a 3,000-acre cattle ranch near Avon, South Dakota, and also own an undivided one-half interest in some pasture land in Yankton County, South Dakota.

The First National Bank in Sioux City, Iowa (bank), the major secured creditor of the debtors, filed a motion for ex parte relief from the stay or, in the alternative, a motion for an expedited preliminary hearing for relief from the automatic stay, a complaint for relief from the automatic stay, and an objection to venue on July 11, 1983. *See* 11 U.S.C.A. § 362(d)–(g) (1979) and Rule 15(c) of the Local Rules of Bankruptcy Procedure. The Court entered an order granting an expedited preliminary hearing on July 12, 1983, and set the preliminary hearing for July 15, 1983, at the Bankruptcy Court in Sioux Falls, South Dakota, at 4:00 p.m.

The expedited preliminary hearing held on July 15 was continued until July 25, and the matters, including the venue question, culminated in a trial on August 25, 1983. The Court, after notice and hearing, officially granted the debtors' motion for joint administration of the three above-entitled bankruptcy cases on July 25, 1983, pursuant to 11 U.S.C.A. § 302 (1979). At the conclusion of the trial, both the debtors and the bank were given the opportunity to thoroughly brief their positions while the Court took the proceedings under advisement.

The two issues confronting the Court, simply stated, are whether the above-entitled bankruptcy cases are properly venued in the District of South Dakota and whether, or to what extent, the Court should modify the automatic stay provisions of 11 U.S.C.A. § 362(a) (1979).

In addition to its objection to venue, the bank contends that its liens in various personal property of the debtors are in jeopardy and that its interests will not be adequately protected unless the stay is lifted to allow it to proceed to foreclose in a pending suit filed in the United States District Court for the District of Nebraska. The bank also alleges that failure to lift the stay will deprive it of its property without due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution. More specifically, the bank claims that the debtors have failed or refused to fully account for the bank's collateral which secures loans totaling nearly five million dollars, that the debtors' property secured to the bank is comingled, that some of the collateral has been moved or sold without prior authorization from the bank, and, most importantly, that only about 1,500 cattle exist, while the debtors allegedly represented an inventory of nearly 8,000 head to justify continued financing from the bank.

The debtors respond to the bank's venue objection by insisting that venue is proper

in South Dakota because the debtors' principle place of business is Avon, South Dakota, and that their principle assets are located there. The debtors also argue that their bankruptcy cases should remain in South Dakota because it would be more convenient for the parties and that the interests of justice would be served by retention. In response to the bank's contentions in regard to the lifting of the automatic stay, the debtors insist that the bank's interest in property of the estates is adequately protected, that the bank can obtain any information it does not already possess upon reasonable notice, that the bank has always been aware that the debtors comingled their assets, that the bank never required prior notice when collateral was sold or moved, and that the debtors deposited all proceeds arising from sales of the bank's collateral in their checking accounts at the bank. In addition, the debtors insist that the bank never performed any exact on-the-farm cattle inventories, that a bank vice-president, Neil Helvig, who was in charge of conducting the on-the-farm inspections of the bank's collateral, was engaged in the business of custom feeding with the debtors, that the bank relied on the actual inventories provided by its employees to determine the collateral available to secure loans made to the debtors, and that the bank customarily provided blank promissory notes and security agreements to the debtors which the debtors signed in blank and forwarded to the bank for completion.

First, the Court will address the bank's multiple arguments for relief from the automatic stay. Thereafter, the issue of venue will be resolved, and, finally, two venue-related items will be discussed.

## RELIEF FROM THE AUTOMATIC STAY

Subsection 362(d) of the Bankruptcy Code prescribes the two legal tests for relief from the automatic stay mandated by subsection 362(a):

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under

subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or
> (2) with respect to a stay of an act against property, if—
>> (A) the debtor does not have an equity in such property; and
>> (B) such property is not necessary to an effective reorganization.

Subparagraph 362(d)(1) allows the stay to be lifted for cause, including, but not limited to, the lack of adequate protection of a party in interest's property. Section 361 specifies three non-exclusive and non-exhaustive means of providing adequate protection of an interest of an entity in property. The legislative history behind section 361 shapes the contours of the concept. See H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 338–40 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. Adequate protection in bankruptcy is based as much on policy grounds as on constitutional grounds. The concept of adequate protection is very flexible. It is designed to protect the interest of an entity in property to the extent of the value of its allowed secured claim during the interim between the filing of a petition in bankruptcy and the filing of a plan of reorganization. In re Rider, 6 B.C.D. 1059 (Bkrtcy.D.Hawaii 1980). Unsecured and undersecured debts do not merit adequate protection because there is no collateral or value securing those debts. See 11 U.S.C.A. § 506(a) (1979). The value of an allowed secured claim for purposes of adequate protection is determined as of the time the bankruptcy petition is filed. In re Auto-Train Corp., 9 B.R. 159, 166 (Bkrtcy.D. D.C.1981).

Subparagraph 362(d)(2) prescribes the second test for relief from the automatic stay. This provision only applies to the stay of an act against property and, being drafted in the conjunctive, it requires both prongs of the two-part test to be satisfied to obtain relief from the stay: (1) debtor has no equity in respective property; and

(2) respective property is not necessary for an effective reorganization. *In re Feimster,* 3 B.R. 11, 14 (Bkrtcy.N.D.Ga.1979). It has been stated that the lack of prospects for a successful rehabilitation is a necessarily included concept of "needed for an effective reorganization." 2 *Collier on Bankruptcy* ¶ 362.07 (15th ed. 1982).

■ Determining the value of a creditor's secured claim for purposes of relief from the automatic stay and adequate protection is, of course, critical to a proceeding for relief from the stay. A bankruptcy court is given wide latitude when determining value for purposes of the automatic stay and adequate protection and, therefore, is not necessarily required to construe value as forced liquidation or full going-concern value. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 338–40 (1977).

■ Subsection 362(g) allocates the burden of proof between the parties to a stay action:

In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—

(1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and

(2) the party opposing such relief has the burden of proof on all other issues.

At the least, under either of the tests stated in subparagraphs 362(d)(1) or (d)(2), a creditor must establish the validity and perfection of its security interest and the amount of the debt and other allowable costs secured by its secured claim and must carry the ultimate burden of proof with respect to equity. *United Companies Fin. Corp. v. Brantley,* 6 B.R. 178, 184 (Bkrtcy.N.D.Fla. 1980). The debtor opposing relief from the stay has the burden on the remaining issues. Moreover, when the creditor demonstrates that the debtor has no equity in the subject property, the burden of showing the necessity of the property for an effective reorganization shifts to the debtor. *In re Bialac,* 15 B.R. 901 (Bkrtcy.App.Panel 9th Cir.1981), *aff'd at* 694 F.2d 625 (9th Cir. 1982).

In the instant case, the bank cites a variety of arguments in support of its request for relief from the automatic stay. Although the bank's arguments do not lend themselves to an exact classification, for purposes of analysis, they will be divided according to whether they address the test for relief from the automatic stay prescribed in subparagraph 362(d)(1) (cause, including lack of adequate protection) and subparagraph 362(d)(2) (debtor has no equity in subject property and property not needed for an effective reorganization).

The bank raises the following eight arguments in support of its position: (1) the debtors' bankruptcy petitions were filed in bad faith; (2) the debtors will never obtain a discharge of the debts they owe the bank because the debts are a product of fraud; (3) there are no prospects that the debtors will ever have a plan of reorganization confirmed; (4) the debtors do not have a reasonable likelihood of rehabilitation; (5) the bank is not adequately protected; (6) the debtors have no equity in the bank's collateral and the property is otherwise not available for an effective reorganization; (7) all of the debtors' equity in all of their assets is subject to a constructive trust or equitable lien in favor of the bank; and (8) the Bankruptcy Court does not have jurisdiction over a proceeding to prove fraud and establish a constructive trust.

Arguments one through five, which primarily relate to the test stated in subparagraph 362(d)(1), will be addressed first. Next, the Court will examine argument six which primarily relates to the test prescribed in subparagraph 362(d)(2). Because arguments seven and eight involve both tests, a separate examination of them will conclude the analysis.

A. *Section 362(d)(1)—"For Cause, Including the Lack of Adequate Protection"*

■ Although there is authority for the proposition that a bankruptcy court may properly grant relief from the automatic stay if a bankruptcy case is filed in bad faith, this Court, following a careful reading of the case law and examination of the

record, is convinced that the instant cases do not merit relief on that basis. *In re Victory Const. Co., Inc.,* 9 B.R. 549 (Bkrtcy. C.D.Cal.1981); *In re Lotus Investments, Inc.,* 16 B.R. 592 (Bkrtcy.S.D.Fla.1981); *Matter of Northwest Rec. Activities, Inc.,* 4 B.R. 36 (Bkrtcy.N.D.Ga.1980). It is clear that the debtors' purpose in filing for bankruptcy was to obtain relief and an opportunity to reorganize their family farm and ranch business. The words of another court faced with a bank's request for relief from the automatic stay based on the allegation of a bad faith filing are relevant to these proceedings:

> A final point remains. Counsel for the Bank in his brief laments: "It is clear that this proceeding had been commenced [by the Levinskys' filing of their chapter 11 petition] solely to obtain the benefit of the automatic stay, prevent foreclosure and gain time to weather the uncertainties and volatility of the mortgage market." (Secured Creditor's Post-Hearing Memorandum of Law, p. 23) This court is very much aware of and sensitive to the present upheaval in the mortgage market and the plight of those banking institutions caught unprepared by the unprecedented surge in interest rates. It is, however, the very purpose of the bankruptcy laws and, in particular, chapter 11 proceedings, to give the deserving debtor the very freedoms and protections to which the Bank objects.

*In the Matter of Levinsky,* 23 B.R. 210, 222 (Bkrtcy.E.D.N.Y.1982). Based on the above analysis and authority, the Court rejects the bank's argument that relief from the stay should be granted because the debtors filed their bankruptcy petitions in bad faith.

■ Whether the debtors' obligations to the bank are a nondischargeable debt which will preclude them from implementing a plan of reorganization is, at best, a premature question. The bank's allegations of fraud must be established by clear and convincing evidence under the applicable provisions of 11 U.S.C.A. § 523 (1979). *Miles Employee Federal Credit Union v. Griffin,*

22 B.R. 821, 824 (Bkrtcy.S.D.Ohio 1982). A proceeding to establish the nondischargeability of a debt must be commenced by complaint and tried as a separate adversary action. *See* Rules of Bankruptcy Procedure 7001 *et seq.* As of the date of this opinion, no such proceedings have been commenced in the instant cases. Clearly, the premature dischargeability issue is not cause to grant the bank's request for relief from the automatic stay.

■ The bank's contentions that there are no prospects that the debtors will ever have a plan of reorganization confirmed and that the debtors do not have a reasonable likelihood of rehabilitation are speculative at this juncture. Too many contingencies need to be resolved. The resolution of the bank's fraud and constructive trust arguments, the issue of dischargeability, and the possibility of the debtors' avoiding the bank's security interest in a substantial number of cattle that are located in South Dakota will all have a significant impact on the feasibility of any plan and the rehabilitation effort.[1] *In re Heatron, Inc.,* 6 B.R. 493, 496 (Bkrtcy.W.D.Mo.1980) (when possible, a court should resolve issues in favor of reorganization). Therefore, the Court must reject the bank's arguments in favor of lifting the stay at least until the outcome of related matters becomes known.

The bank also argues that the collateral securing its various liens is not adequately protected. The bank claims to have a valid perfected security interest in several types of personal property, including, but not limited to, growing crops, equipment, livestock, and other farm products. As discussed earlier, it is the allowed secured claim as of the time of the filing of the respective bankruptcy petition that warrants adequate protection. The record is not clear as to the value of the bank's allowed secured claim as of the time the debtors' petitions were filed. There is no accurate method of determining what pieces of equipment are the bank's collateral and which pieces are the collateral of purchase-money holders. Moreover,

1. *See* 11 U.S.C.A. § 547 (1979) (Preferences).

the record does not indicate whether the equipment is depreciating or, if it is, the amount of the depreciation.

In fact, it is clear that most of the bank's collateral is a type that would not depreciate but rather appreciate subsequent to the date the bankruptcy petitions were filed. Growing crops, full of potential but far from fruition, are now harvestable bumper crops. As an added bonus, the Court takes judicial notice of the fact that corn prices are now at least as high and soybean prices are significantly higher now than they were in July when the petitions were filed.[2] The livestock, both cattle and hogs, have gained weight since the petitions were filed. In the case of the cattle, the gain has been financed by the lessor of the Avon, South Dakota, ranch who could well become an unsecured creditor if the lease is rejected or the bankruptcies dismissed or converted. See 11 U.S.C.A. § 365(g) (1979).

■ Adequate protection must be considered on a case-by-case basis and upon equitable considerations arising from the facts of each case. "Where the non-debtor party is in the business of extending credit, a moratorium on debt service, if accompanied by measures to preserve the collateral's value, may suffice." 2 Collier on Bankruptcy ¶ 361.01[4] and ¶ 362.07[1]. The instant debtors and the bank have been financing partners in the farming and ranching business for over a decade. Considering the fact that the bank's allowed secured claim is not presently subject to impairment, but rather has appreciated (See 11 U.S.C.A. § 552(b) (1979)), this Court concludes that, at least for now, the bank is adequately protected. This conclusion is bolstered by the Court's order in a recent cash collateral proceeding requiring the debtors to provide a certificate of insurance and submit copies of bank statements and financial reports to the bank on a periodic basis.[3] It should be stressed, however, that the bank is not precluded from requesting relief if circumstances should change in the future.

### B. The Application of Section 362(d)(2)

As noted earlier, subsection 362(d)(2) prescribes a two-pronged test for relief from the automatic stay. Relief from the stay will only be granted if both prongs of the test are satisfied; that is, the debtor lacks equity in the subject property and the property is not necessary for an effective reorganization. In re Feimster, supra. As discussed earlier, the plaintiff has the burden on the issue of the debtor's lack of equity, and if the plaintiff meets his burden, the burden shifts to the debtor to prove that the property is necessary for an effective reorganization.

■ There is no doubt that the instant debtors possess no equity in the collateral secured by the bank. Neither side disputes this conclusion. Consequently, the burden falls on the debtors to prove that the subject property is necessary for an effective reorganization. Page 33 of the transcript from the July 25, 1983, hearing amply establishes that the debtors need the livestock, crops, equipment, and other farm products secured to the bank to accomplish an effective reorganization. Based on the debtors' testimony during the consolidated proceedings and considering that the bank's allegation that the prospects for a successful reorganization are dim have already been rejected, the Court concludes that the bank is not entitled to relief from the stay under subparagraph 362(d)(2) of the Bankruptcy Code.

### C. Constructive Trust and Jurisdiction

■ The bank insists that the debtors have no equity in any of their assets because that equity is the fruit of fraud perpetrated by the debtors upon the bank and, therefore, subject to a constructive trust for the benefit of the bank or an equitable lien in favor of the bank. The

---

**2.** This conclusion is based on market values received from the Minneapolis Grain Exchange comparing spot prices as of July 5, 1983, and October 17, 1983.

**3.** Cash collateral order entered July 25, 1983.

equitable remedy of a constructive trust is recognized in the Nebraska common law in situations where a plaintiff can prove unjust enrichment because of a defendant's fraud or other wrongdoing. *Nebraska Nat'l Bank v. Johnson,* 51 Neb. 546, 71 N.W. 294 (1897); *Meier v. Geldis,* 148 Neb. 304, 27 N.W.2d 215 (1947); *Jordon v. Butler,* 182 Neb. 626, 156 N.W.2d 778 (1968). The case law also addresses the necessity of the plaintiff's tracing the proceeds of the wrongdoing and the existence of the good faith purchaser defense.[4]

■ Although the bank's briefs do not cite any cases or treatises that comprehensively analyze the constructive trust remedy in the context of bankruptcy, there is no shortage of good authority on the subject. *Schuyler v. Littlefield,* 232 U.S. 704, 34 S.Ct. 466, 58 L.Ed. 806 (1914); *Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924); *Matter of Kennedy & Cohen, Inc.,* 612 F.2d 963 (5th Cir.1980); *Rosenberg v. Collins,* 624 F.2d 659 (5th Cir.1980); *Georgia Pacific Corp. v. Sigma Service Corp.,* 712 F.2d 962 (5th Cir.1983); *In re Shepard,* 29 B.R. 928 (Bkrtcy.M.D.Fla.1983); 4 *Collier on Bankruptcy* ¶ 541.13 (15th ed. 1983) (and cases cited thereby). A fair reading of this authority requires a federal court to apply state law when determining questions as to rights of competing interests in property. It appears that a plaintiff seeking a constructive trust must clear at least four hurdles: (1) prove fraud or wrongdoing on the part of the defendant; (2) escape the defense of unclean hands;[5] (3) trace the proceeds of the fraud to specific assets; and (4) escape the potential defense that the holder of the traced proceeds is a good faith purchaser.

Under section 541(a) of the Bankruptcy Code, all of a debtor's interests, both legal and equitable, become part of the bankruptcy estate. Subsection 541(d) of the Code, however, stands for the proposition that the estate acquires no greater interest in property, except through certain lien avoidance provisions contained elsewhere in the Code and not applicable here, than that possessed by the debtor. Thus, if the debtor only has legal, but not equitable, title in certain property, the estate only holds legal title. A constructive trust, if established, recognizes bifurcated title, with the entity possessing the property having only bare legal title, while the beneficial or equitable interest is held by the person entitled to the property. Bare legal title is of no value to a bankruptcy estate and, subject to tracing, the subject property should be abandoned under 11 U.S.C.A. § 554 (1979) or merit an order conveying it to the equitable owner.

There is a big difference between alleging fraud and proving it. Likewise, there is a great difference between maintaining that debtors have no equity in any of their assets because those assets are subjected to a constructive trust and actually meeting all of the elements that are the prerequisites to that remedy. In the instant case, the bank should have an opportunity to prove its case, but until it does so or otherwise proves that it is not adequately protected, the bank is not entitled to relief from the automatic stay to foreclose on any of its collateral. The debtors cannot file a plan of reorganization nor can their prospects of having a plan confirmed be determined until the bank's fraud and constructive trust allegations are resolved one way or another.

---

**4.** This defense has been used successfully by third persons who have accepted converted currency in satisfaction of a valid pre-existing obligation owed by a converter. *See Transamerica Insurance Co. v. Long,* 318 F.Supp. 156 (W.D.Pa.1970) ("It is a rule of law that title to currency passes with delivery to the person who receives it in good faith and for valuable consideration.").

**5.** One of the "maxims" of equity is: "He who comes into equity must come with clean

hands." *See Green v. Higgins,* 217 Kan. 217, 535 P.2d 446 (1975). Evidence that the bank provided the debtors with blank copies of security agreements and promissory notes and that a high ranking bank officer, who was responsible for inspecting the bank's collateral in the debtors' possession, had a custom feeding arrangement with and sold cattle to the debtors may be relevant to the affirmative defense of "unclean" hands in the instant case.

■ Consequently, the automatic stay mandated by 11 U.S.C.A. § 362 (1979) should be modified to allow the bank to proceed on its allegation that the debtors fraudulently obtained loans from the bank and, therefore, all of the debtors' equity in assets is subject to a constructive trust in favor of the bank. The thrust of the bank's theory is so closely connected with state law that to avoid any jurisdictional disputes created in the wake of *Northern Pipeline Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), or under the subsequently enacted Interim Rule, the matter should be tried by the federal court in Omaha, Nebraska, under its original bankruptcy jurisdiction as provided in 28 U.S.C.A. § 1471(a) (Supp.1982). *See In re Braniff Airways, Inc.,* 700 F.2d 935 (5th Cir.1983); Weisbart, *A Practical Look at the Interim Rule,* 88 Com.L.J. 371 (1983). This avenue may avoid any jurisdictional problems that might otherwise arise where jurisdiction is based on diversity. It occurs to this Court that some of the debtors' unsecured and even secured creditors and still other parties may be joined or desire to intervene given the theory of the bank's lawsuit and its potential effect on the rights of third parties. Basing jurisdiction on 28 U.S.C.A. § 1471(a) (Supp.1982) also avoids any Seventh Amendment trial by jury problems that might surface if the matter were tried in a bankruptcy court which is precluded from conducting jury trials. *See* 88 Com.L.J. 371, *supra* at 375; *In re Professional Air Traffic Controllers, Etc.,* 23 B.R. 271 (D.C.D.C.1982) (existence of fact questions gives rise to right to jury trial). In the interest of economy and justice, the district court may wish to require any dischargeability or discharge issues to be combined with the fraud trial. *See* 11 U.S.C.A. §§ 523, 727 (1979). Moreover, since the pleadings in the bank's current suit against the debtors filed in federal district court in Omaha and styled as *First National Bank in Sioux City v. Marlyn Dahlquist, et al,* Civ. No. 83-0-481, probably do not plead fraud in particularity or pray for a constructive trust remedy, a new complaint is necessary. *See* F.R. of Civ. Proc. 9(b).

For all of the above-mentioned reasons, the automatic stay is modified to allow the bank to pursue its fraud claim and related remedy of a constructive trust against the debtors. To the extent that the bank's suit joins third parties or third parties intervene and the stay might prevent them from doing so, the stay is so modified to allow them to participate. Counsel for the bank is directed to submit an order consistent with the Court's findings and conclusions in these automatic stay proceedings, denying in part and granting in part the bank's request for relief in accordance with Bankruptcy Rule 9021. The order must be submitted to the Clerk of this Court no later than October 28, 1983, and the order, by its terms, will expressly direct the Clerk to enter it prior to entering any order resolving the venue issue in these bankruptcy proceedings.

### VENUE

■ The bank has objected to the venue of these proceedings since their outset and has consistently maintained that its appearance in the United States Bankruptcy Court for the District of South Dakota is without waiver of objection to venue. The party moving for a change in venue must show by a preponderance of the evidence that the case should be transferred. *In re Commonwealth Oil Refining Co., Inc.,* 596 F.2d 1239, 1241 (5th Cir.1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980) (hereinafter *CORCO*); *In re Island Club Marina, Ltd.,* 26 B.R. 505, 507 (Bkrtcy. N.D.Ill.1983); *In re Cole Associates, Inc.,* 7 B.R. 154, 157 (Bkrtcy.D.Utah 1980). The resolution of a venue question is left to the sound discretion of the trial court based on its understanding of the requirements of the particular case in the context of chapter 11 reorganization. *Matter of Landmark Capital Co.,* 19 B.R. 342 (Bkrtcy.S.D.N.Y. 1982).

The venue of bankruptcy proceedings is primarily governed by 28 U.S.C.A. §§ 1472, 1475, 1477, and by Bankruptcy Rule of Pro-

cedure 1014. The other venue statutes relating to bankruptcy matters contained in title 28 of the United States Code are not relevant to the instant decision. Section 1472 is the basic venue proceeding and reads as follows:

Except as provided in section 1474 of this title, a case under title 11 may be commenced in the bankruptcy court for a district—

(1) in which the domicile, residence, principal place of business, in the United States, or principal assets, in the United States, of the person or entity that is the subject of such case have been located for the 180 days immediately preceding such commencement, or for a longer portion of such 180-day period than the domicile, residence, principal place of business, in the United States, or principle assets, in the United States, of such person were located in any other district; or

(2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

Section 1472 must be read in the disjunctive. That is, a party opposing venue must prove that neither the debtor's domicile, residence, principle place of business, or principle assets have been located in the place of filing for 180 days immediately preceding the filing of a case.

It is undisputed that the instant debtors are not residents of South Dakota nor is South Dakota their domicile. Rather, the dispute centers around whether the debtors' principle assets or place of business was located in South Dakota or in Nebraska the 180 days immediately preceding the filing of their petitions in bankruptcy. The location of the debtors' principle assets and principle place of business is a question of fact. *CORCO, supra* at 1245. Several decisions define a debtor's principle place of business as the place where the debtor makes its major business decisions, regardless of the physical location of its assets. *CORCO, supra* at 1244, 1247; *In re Green-*

*ridge Apartments,* 13 B.R. 510 (Bkrtcy.D. Hawaii 1981).

 The instant debtors keep all of their books and records in Nebraska and have always banked in Nebraska. There is no doubt that the debtors make their overall management decisions at their home farm in Laurel, Nebraska, and that all financing has been derived in Nebraska. Consequently, the Court concludes that the debtors' principle place of business is in Nebraska and, therefore, venue on that basis must also lie in Nebraska.

The record supports the bank's contention that the principle assets of the debtors are located in Nebraska, not South Dakota. Although most of the debtors' livestock is located in South Dakota, the vast majority, both in terms of quantity and value, of the debtors' real property interests, feed grain, silage, growing crops, and machinery is located in Nebraska. Indeed, a close examination of the record and the debtors' bankruptcy schedules supports this conclusion. The debtors' only claims to real property in South Dakota are an undivided one-half interest in 120 acres of grass land and a five-year lease on a large cattle ranch near Avon, South Dakota. Moreover, the bulk of the land the debtors own and lease in Nebraska is highly productive irrigated farm ground, while the vast majority of the South Dakota real estate is pasture land. Consequently, considering the foregoing, venue cannot be based on the theory that the debtors' principle assets are located in South Dakota.

 Because the bank has proven by a preponderance of the evidence that the debtors' domicile, residence, principle place of business, and principle assets are located in Nebraska rather than South Dakota, the Court concludes that the venue of the instant consolidated cases, under the provisions of 28 U.S.C.A. § 1472, properly lies in Nebraska. This conclusion, however, does not dispose of the venue question. A bankruptcy court, after notice and hearing, may retain a case laying venue in the wrong district in the interest of justice and for the convenience of the parties. *See* 28 U.S.C.A.

§§ 1475,[6] 1477(a),[7] and Bankruptcy Rule of Procedure 1014(a).[8] The Court has determined that the proper venue under 28 U.S.C.A. § 1472 lies in Nebraska; thus, the burden of proof shifts to the debtors to prove by a preponderance of the evidence that retention of the instant cases in South Dakota would be in the interests of justice and for the convenience of the parties. *Cf In re One-Eighty Investments, Ltd.,* 18 B.R. 725, 728 (Bkrtcy.N.D.Ill.1981).

██ An application for retention of venue on the basis of the convenience of the parties and in the interests of justice requires this Court to examine all of the facts in the light of six criteria: (1) proximity of creditors of every kind; (2) proximity of the debtor to the court; (3) location of the assets; (4) proximity of witnesses; (5) intertwined relationships; and (6) economical and efficient administration. *See In re Island Club Marina, Ltd., supra.*

██ Creditors of every kind, both in terms of numbers and amounts owed, are, as a whole, about the same distance from the alternative court points of Sioux Falls, South Dakota, and Omaha, Nebraska. The debtors, and most of the potential witnesses, too, are about the same distance from the two court points. Therefore, as far as the convenience of the creditors, debtors, and witnesses is concerned as relates to their proximity to the two court points, there is no significant difference one way or the other. Justice, however, dictates that

venue should be resolved in favor of the forum where the debtors, most of the creditors, and the bulk of the potential witnesses reside and principally operate their businesses. This result discourages forum shopping, which is not favored in the law, and holds the moving party to both prongs of the two-part test of convenience of the parties and the interests of justice.

As discussed earlier, the majority of the debtors' assets are located in Nebraska. Although the location of the debtors' assets is not determinative in reorganization cases, this factor favors venue in the Nebraska forum. *In re One-Eighty Investments, Ltd., supra* at 729.

The factor of intertwined relationships is not relevant to the present inquiry and, thus, will not be addressed.

The final factor to consider is the economical and efficient administration of the bankruptcy estate. This factor is the most important consideration and, although an independent factor, it encompasses all of the preceding five factors. *In re Island Club Marina, Ltd., supra.* It has already been determined that the convenience of the creditors, debtors, and witnesses is not significant as regards their proximity to the alternative court points. Justice, however, favors venue in Nebraska on these factors because forum shopping should not be encouraged. The factor of intertwined relationships is not relevant here. Most of the

---

6. "A bankruptcy court may transfer a case under title 11 or a proceeding arising under or related to such a case to a bankruptcy court for another district, in the interest of justice and for the convenience of the parties."

7. "The bankruptcy court of a district in which is filed a case or proceeding laying venue in the wrong division or district may, in the interest of justice and for the convenience of the parties, retain such case or proceeding, or may transfer, under section 1475 of this title, such case or proceeding to any other district or division."

8. TRANSFER OF CASES.
 (1) *Cases Filed in Proper District.* If a petition is filed in a proper district, on timely motion of a party in interest, and after hearing on notice to the petitioners and to other persons as directed by the court, the case may be transferred to any other district if the court determines that the transfer is for the convenience of the parties and witnesses in the interest of justice.
 (2) *Cases Filed in Improper District.* If a petition is filed in an improper district, on timely motion of a party in interest and after hearing on notice to the petitioners and to other persons as directed by the court, the case may be retained or transferred to any other district if the court determines that the retention or transfer is for the convenience of the parties and witnesses in the interest of justice. Notwithstanding the foregoing, if no objection is raised, the court may, without a hearing, retain a case filed in an improper district.

debtors' assets are located in Nebraska and, thus, this factor favors venue in Nebraska. All matters considered, a Nebraska forum is in a better position to apply that state's law and to satisfy the local interest in applying that law through courts within the state. *In re Cole Associates, Inc., supra.*

Accordingly, the debtors have failed to prove by a preponderance of the evidence that the instant case should be retained in South Dakota for the convenience of the parties and in the interest of justice when the case is otherwise not properly venued in South Dakota. This case could be more economically and efficiently administered in Nebraska.

Counsel for the bank is directed to draft an order in accordance with rule 9021 of the Bankruptcy Rules of Procedure transferring the instant cases to the United States Bankruptcy Court for the District of Nebraska with due regard for the needs of the District Court for the District of South Dakota as relates to any appeals pending in this matter.

Two further matters relating to venue need to be addressed. One deserves explanation and the other merits comment. First, the nature of the chapter 11 reorganization process, coupled with the hostility between the bank and the debtors, precluded this Court from expeditiously deciding the venue question and thus avoiding related matters such as expedited hearings on cash collateral, injunctive relief, and, of course, relief from the automatic stay. The debtors needed the use of cash collateral on an emergency basis to properly care for their growing crops and livestock that were mortgaged to the bank. The bank needed to be adequately protected for the debtors' use of its cash collateral. Counsel for the bank insisted in chambers that they had no choice but to proceed to the merits of the stay issue and that the bank's collateral was in danger of being secreted.

Although the bank was willing to address only the venue issue, it is clear that it would not have assented to doing so if the Court was going to entertain the debtors' request for the use of cash collateral. The bank's opposition to the use of cash collateral was just too intertwined with its theory in the relief from stay action. Moreover, without the use of cash collateral, the debtors' prospects for a successful reorganization and the care of the bank's collateral would have been severely jeopardized.

This Court spends three of every four weeks on the road without the luxury of a large staff or a law library. The Court calendar is filled for at least three months in advance. It is not unusual for this Court to be in session late into the evening, occasionally extending into the early morning hours. Given the nature of the reorganization process as contemplated by the Congress in the Bankruptcy Code, the high degree of animosity between the parties, the need to protect the irrigated crops and livestock that were the bank's collateral, and the demands on the Court, it was absolutely necessary to retain these cases until preliminary matters could be put in place, briefed, and finally resolved. The available alternatives were not as viable as a superficial glance at the record might indicate.

In regard to the second venue-related matter, it is important to realize that the Court's disposition of the venue issues in these cases was not influenced one iota by the multitude of ex parte letters it received from Nebraska creditors. Most of the letters and petitions contained the same short paragraph demanding that the instant proceedings be transferred to Nebraska. Some even alleged that creditors' prospects would be better served by a transfer to a more conservative Nebraska forum.

The *Code of Judicial Conduct for United States Judges* expressly forbids a judge from considering ex parte contacts:

> A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding. A judge, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding before him if he

gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond.

*Code of Judicial Conduct for United States Judges,* Canon 3A.(4) (1973). The Court's resolution of the venue issue presented in these consolidated cases is based exclusively on the applicable law, the facts presented in open court, and counsel's arguments, both oral and written. This Court's decision on venue in no way reflects, in any manner, shape, or form, the numerous letters and petitions it received from Nebraska creditors demanding that the cases be transferred.

It would be convenient, although not responsible, to close the matter of ex parte contacts at this juncture. The Court, however, cannot do so in good conscience. Two letters are appended to this decision. Both were written by George F. Madsen, one of the lawyers for the bank. The first letter (marked Exhibit "A") is a letter to the Honorable John B. Jones, United States District Judge for the District of South Dakota. Obviously, Judge Jones was also the recipient of numerous letters from Nebraska creditors although the appeals he had before him did not relate to the venue issue which was pending in the Bankruptcy Court.

The second letter (marked Exhibit "B"), admittedly authored by Attorney Madsen, is addressed to a large unsecured creditor of the debtors. The fourth full paragraph of the letter is revealing:

> If you do not plan to hire a lawyer, it would be helpful if you simply wrote the Court, advising the Court of your objections to the proceedings in South Dakota. Obviously, if other creditors of your acquaintance were to file the same sort of protest, there is a better likelihood that the cases would be moved from South Dakota.

Mr. Madsen's attempts to pass an obvious effort to encourage ex parte contacts with this Court, both directly and through his client, as a "layman's misunderstanding" (*See* Ex. "A" at ¶ 2) is a most unconvincing pretense. Whether one consults Black's Law Dictionary, Words and Phrases, an experienced lawyer, or a man on the street—"Court" and "Judge" are regarded as synonymous.

The *Canons of Professional Responsibility* speak to this type of regrettable behavior:

> *Misconduct.*
>
> (A) A lawyer shall not:
>
> (1) Violate a Disciplinary Rule.
>
> (2) Circumvent a Disciplinary Rule through actions of another.
>
> (3) Engage in illegal conduct involving moral turpitude.
>
> (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
>
> (5) Engage in conduct that is prejudicial to the administration of justice.
>
> (6) Engage in any other conduct that adversely reflects on his fitness to practice law.

*Model Code of Professional Responsibility,* Canon 1, DR 1–102 (1979).

> All litigants and lawyers should have access to tribunals on an equal basis. Generally, in adversary proceedings a lawyer should not communicate with a judge relative to a matter pending before, or which is to be brought before, a tribunal over which he presides in circumstances which might have the effect or give the appearance of granting undue advantage to one party. For example, a lawyer should not communicate with a tribunal by a writing unless a copy thereof is promptly delivered to opposing counsel or to the adverse party if he is not represented by a lawyer. Ordinarily an oral communication by a lawyer with a judge or hearing officer should be made only upon adequate notice to opposing counsel, or, if there is none, to the opposing party. A lawyer should not condone or lend himself to private importunities by another with a judge or hearing officer on behalf of himself or his client.

*Model Code of Professional Responsibility,* Canon 7, EC 7–35 (1979).

In an adversary proceeding, a lawyer shall not communicate, or cause another to communicate, as to the merits of the cause with a judge or an official before whom the proceeding is pending, except:

(1) In the course of official proceedings in the cause.

(2) In writing if he promptly delivers a copy of the writing to opposing counsel or to the adverse party if he is not represented by a lawyer.

(3) Orally upon adequate notice to opposing counsel or to the adverse party if he is not represented by a lawyer.

(4) As otherwise authorized by law, or by Section A(4) under Canon 3 of the Code of Judicial Conduct.

*Model Code of Professional Responsibility,* Canon 7, DR 7–110(B) (1979).

Every lawyer owes a solemn duty to uphold the integrity and honor of his profession; to encourage respect for the law and for the courts and the judges thereof; to observe the Code of Professional Responsibility; to act as a member of a learned profession, one dedicated to public service; to cooperate with his brother lawyers in supporting the organized bar through the devoting of his time, efforts, and financial support as his professional standing and ability reasonably permit; to conduct himself so as to reflect credit on the legal profession and to inspire the confidence, respect, and trust of his clients and of the public; and to strive to avoid not only professional impropriety but also the appearance of impropriety.

*Model Code of Professional Responsibility,* Canon 9, EC 9–6 (1979).

A lawyer has both a duty and an obligation to represent his client with great zeal at every step of the adversary process. That zeal, however, must be confined within the bounds of professional responsibility. Lawyers are officers of the court; they cannot and must not acquiesce to pressure from hostile or over-zealous clients.[9]

Mr. Madsen is a competent lawyer. His actions which encouraged ex parte contacts with this Court, and his failure to preclude his client from doing so, cannot be condoned. Unfortunately, either recklessly or intentionally, he unwittingly stepped across the line. The Court is convinced that he has learned a valuable lesson, that this type of behavior is uncharacteristic, and that it will not happen in the future. Accordingly, although the incident compels comment, it did not precipitate the necessity of requesting Mr. Madsen and his firm to withdraw from the instant cases while they were pending before this Court.

All of the above constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52. Counsel for the bank shall submit appropriate orders consistent with this opinion in accordance with Bankruptcy Rule 9021.

## APPENDIX

Page

Exhibit "A" (letter to the Honorable John B. Jones from Attorney George F. Madsen) ............ 491

Exhibit "B" (letter to large unsecured creditor of the debtors from Attorney George F. Madsen) .. 492

---

9. It should be noted that on July 28, 1983, this Court found co-counsel for the bank, Attorney F. Joseph Du Bray, in contumacious contempt of the Court and assessed sanctions against him for his bad faith dealings with the Court and his failure to communicate with the Court. This is the only occasion in fourteen years that this judge has found it necessary to sanction a lawyer. Moreover, in fairness, the record should indicate that the bank's local counsel, Attorney Edward J. Leahy, represented his client with great zeal but within the bounds of professional responsibility.

EXHIBIT "A"

SHULL, MARSHALL & MARKS

ATTORNEYS AT LAW

BADGEROW BUILDING

P.O. Box 1077

SIOUX CITY, IOWA 51102

AREA CODE 712 258–7513

August 31, 1983

Hon. John B. Jones
United States District Judge
United States District Court
District of South Dakota
400 South Phillips Avenue
Sioux Falls, South Dakota 57102

 Re: *Marlyn Verle Dahlquist,* Case No. 483–00230

 *Robert Dean Dahlquist,* Case No. 483–00238

 *James Marlyn Dahlquist,* Case No. 483–00239

Dear Judge Jones:

We received your letter of August 30, 1983 forwarding materials received by you from Mrs. Walter Chase. We have also received from Judge Ecker a copy of his letter of August 29, 1983 wherein he advised that after receipt of materials from some fifty creditors he contacted Mr. William D. Dendinger and Mrs. Chase, two creditors.

Attached is a copy of a letter dated August 10, 1983 sent by the undersigned to Dr. and Mrs. Chase. Please note that in the fourth paragraph of that letter the word "Court" is used, rather than the word "Clerk". It occurs to us that a layman could misconstrue the word "Court" to mean "Judge", and thus the letter could be construed to encourage an *ex parte* contact with Judge Ecker.

We note in the materials you sent that in a letter dated August 25, 1983 to you Mrs. Chase states in part: "I have already sent some of the signed petitions to the bankruptcy court but was told today that I should maybe be sending them to you." In checking today with Mr. R.C. Taylor, president of The First National Bank in Sioux City we found that he did have a telephone conversation with Mrs. Chase on August 25, 1983 and there was some discussion and confusion concerning the first meeting of creditors hearing before the Trustee set for August 30, 1983. Mr. Taylor furnished Mrs. Chase with your name and address, and encouraged her to send materials to you rather than the U.S. Trustee. As counsel for the Bank, we assume full and complete responsibility for this suggestion made by our client and regret that it was given. We would note that at the first meeting Mrs. Chase was in attendance and was advised by the standing trustee that he was not a Judge.

This office, Mr. Leahy's office, and the First National Bank in Sioux City did not prepare any of the materials sent to you or Judge Ecker, or to the U.S. Trustee, if any were sent to him by Mrs. Chase or any other creditor. At our hearing before you on August 30, 1983 you advised that Mrs. Chase called you to protest Judge Ecker's call to her. This office, Mr. Leahy's office, and the Bank had no knowledge of that call until it was disclosed by you, and had no knowledge that Mrs. Chase intended to call you.

Mr. Du Bray and Mr. Leahy did not know of my August 10, 1983 letter to Dr. and Mrs. Chase until today.

We bring these matters to your attention and to the attention of Judge Ecker by a copy of this letter because if either of you are of the view that the actions of this office encouraged or condoned, directly or indirectly an improper *ex parte* judicial contact, this firm will promptly withdraw as counsel in the above bankruptcy proceedings and any appeals therefrom. Should you be of that view, please advise.

At our hearing before you on the 30th, you asked for counsels' view as to whether the materials received by you constitute "an appeal" from the Bankruptcy Court by Dr. and Mrs. Chase. In our view the materials are not "an appeal" and if such should be

'regarded as an appeal, First National Bank would not be a party thereto.

Thank you.

<div style="text-align:center">

Very truly yours,

/s/ George F. Madsen

For the firm

</div>

GFM:jb

Enc.

cc: Hon. Peder K. Ecker

 Mr. William P. Westphal, Sr.

 Mr. John R. Kabeiseman

 Mr. John E. Harmelink

 Mr. Ed Leahy

<div style="text-align:center">

EXHIBIT "B"

August 10, 1983

</div>

Dr. and Mrs. Walter Chace

Laurel Veterinary Clinic

Laurel, NE 68745

Re: Dahlquist Matters

Dear Dr. and Mrs. Chace:

We are attorneys for First National Bank in Sioux City.

Dick Taylor told us of Mrs. Chace's visit with him and of your concern that the Bankruptcy case has been filed in Sioux Falls rather than Omaha.

The Bank has filed an objection to the South Dakota venue (location of the case). It would be helpful if other creditors did the same. We suggest you contact your counsel and ask that an objection to venue be filed on your behalf. It is important that the venue objection be filed before you participate in the Bankruptcy in any way, otherwise the Court will likely say you waived the venue objection.

If you do not plan to hire a lawyer, it would be helpful if you simply wrote the Court, advising the Court of your objections to the proceedings in South Dakota. Obviously, if other creditors of your acquaintance were to file the same sort of protest, there is a better likelihood that the cases would be moved from South Dakota.

Could you please send us a summary by years of the debt which the Dahlquists owed you? The Bank has financial statements from the Dahlquists for a number of years and we would like to try to identify where the Dahlquists disclosed their debt to you.

If you could furnish us the names and addresses of other persons to whom you know Dahlquists owed money over the past ten years, it may be helpful to us.

Thank you.

<div style="text-align:right">

Very truly yours,