**In re FLAGLER–AT–FIRST ASSOCI- ATES, LTD., a Florida limited partnership, Debtor.**

**Bankruptcy No. 88–01097–BKC–AJC.**

United States Bankruptcy Court, S.D. Florida.

Feb. 8, 1990.

Brian K. Gart, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., Miami, Fla., for Foremost Investments, N.V.

John H. Genevese, Stroock & Stroock & Lavan, Miami, Fla., for Flagler–At–First Associates, Ltd.

Michael Ullman, Ullman & Ullman, N. Miami Beach, Fla., for Capital Bank.

Richard S. Rachlin, Payton & Rachlin, P.A., Miami, Fla., for Flagler–At–First Associates, Ltd.

Roger G. Metcalf, Miami, Fla., for Sunbeam Television Corp.

## MEMORANDUM OPINION DENYING DEBTOR'S MOTION TO ADJUST SECURED CLAIM

A. JAY CRISTOL, Bankruptcy Judge.

This cause came before the Court on November 29, 1989, for the hearing on the Amended Motion to Adjust Foremost Investments N.V.'s Secured Claim filed by the Debtor/Debtor–in–Possession, Flagler–At–First Associates, Ltd., a Florida limited partnership ("Flagler"). This Memorandum Opinion is intended to constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52 and Bankruptcy Rules 7052 and 9014.

### THE EVIDENCE

Flagler has since 1984 owned and operated a 14–story office building in downtown Miami, located at 14 Northeast 1st Avenue, known as the Israel Discount Bank Building (the "Building"). On February 19, 1988, Flagler filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Court is familiar with Flagler's operation of the Building and efforts to reorganize through related adversary proceedings and numerous hearings pertaining to adequate protection and valuation issues.

Pursuant to the Agreed Order on Adequate Protection, Use of Cash Collateral and Motion to Set Procedure for Foreclosure dated June 28, 1988 (the "Agreed Cash Collateral Order"), Flagler has been paying monthly post-petition payments to Foremost Investments, N.V. ("Foremost") since June 1, 1988. By virtue of this Court's Memorandum Opinion of March 10, 1989 (the "Valuation Order"), Foremost was determined to be an undersecured creditor. The Valuation Order, in addition to valuing the Building at $9 million, also valued the claims of Sunbeam Television Corporation ("Sunbeam"), Capital Bank ("Capital") and Foremost as of the commencement of the case. Sunbeam has a first mortgage lien on the Building and Capital a second. Foremost holds a Wrap–Around Mortgage wrapping the first and second mortgages (the "Wrap Mortgage"). As of the commencement of the case Foremost acknowledges that the total amount due under the Wrap Mortgage was $10,845,235.63, as demonstrated in part by this Court's Final Judgment of Foreclosure dated May 16, 1989 in the related adversary proceedings captioned *Flagler–At–First Associates Ltd. v. Sunbeam Television Corp.*, Adversary No. 88–0347–BKC–AJC–A; *Foremost Investments, N.V. v. THG, Inc.*, Adversary No. 88–0273–BKC–AJC–A (the "Foreclosure Judgment").

The relevant evidence is not in dispute. It is agreed that as of the commencement of the case Sunbeam was owed approximately $875,000 and Capital owed approximately $2,725,000, subject to the terms of the Wrap Mortgage. The Building has been generating gross rental revenues of approximately $1.5 million per year during the Chapter 11. Further, the parties agree that monthly payments of $69,617.66 have been made to the mortgagees under the terms of the Wrap Mortgage and that, of this amount, Foremost has received approximately $440,000 as "adequate protection". The parties have also stipulated that pursuant to the Agreed Cash Collateral Order the monthly post-petition payments were in an amount equal to the interest payable on one of the promissory notes secured by the Wrap Mortgage. There is also no dispute, and the cash flow reports from the Building reflect, that the monthly net operating income or excess rent generated during the Chapter 11 has been approximately equal

to the amount of the monthly payments and is the source therefor.

The balance of the $69,617.66 monthly payment has been paid in the form of monthly principal and interest payments to Sunbeam, thereby reducing the amount owed during the Chapter 11 to an outstanding balance under the Wrap Mortgage of approximately $675,000. During the Chapter 11 Capital has only received current interest on its claim as adequate protection. The balance of the $130,000 per month rental revenues have been used by Flagler to pay the post-petition expenses of the Building, thereby benefitting Flagler's efforts to reorganize.

In this controversy, Flagler asserts that Foremost, as an undersecured creditor, was not entitled to adequate protection payments, absent a showing that the Building was declining in value and then only to compensate for such decline, relying on *United Savings Association of Texas v. Timbers of the Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (hereinafter *"Timbers"*). Accordingly, Flagler seeks to reduce Foremost's secured claim for treatment in its pending plan of reorganization by the amount of the payments on the basis that such payments should only be applied to the principal secured indebtedness due to Foremost as an undersecured creditor.

### RESOLUTION OF THE LEGAL ISSUES

The few post-*Timbers* cases discussing the application of post-petition payments to undersecured claims *generally* support the result that to the extent such payments exceed a decrease in value of the collateral, they should be applied to reduce the secured portion of the claim. *See In re Maun,* 95 B.R. 94 (Bankr.S.D.Ill.1989); *Matter of Kain,* 86 B.R. 506 (Bankr.W.D. Mich.1988); *In re Sherwood Square Associates,* 87 B.R. 388 (Bankr.D.Md.1988); and *In re Canaveral Seafoods, Inc.,* 79 B.R. 57 (Bankr.M.D.Fla.1987).

In interpreting Sections 361 and 362 of the Bankruptcy Code, in light of the express language of Sections 502 and 506, the Supreme Court in *Timbers* explicitly held that an undersecured creditor's "interest in property" does not include the right to post-petition interest or lost opportunity costs for the delay in its recovery of its collateral prior to confirmation. However, its "interest in property" would include the right to be compensated against any decline in the value of its collateral. *Timbers,* 108 S.Ct. at 629–30.

In its memorandum in opposition to the Flagler Motion, Foremost recognizes that under *Timbers* an undersecured creditor is not entitled to interest on its collateral during the automatic stay to assure adequate protection. However, based on the nature of the collateral at issue and the specific facts before the Court, Foremost disputes Flagler's assertion that *Timbers* requires a reduction of Foremost's secured claim in this case. The Court is persuaded that Foremost is an undersecured creditor whose collateral, by operation of law and the terms of the Agreed Cash Collateral Order, has been declining in value while the stay has been in effect. Acceptance of Flagler's position would require the conclusion that Foremost has no interest in the post-petition rental revenues generated by the Building. 11 U.S.C. § 552(b). It would be inequitable to so conclude.

As a preliminary matter, Foremost has never contended that it was entitled to post-petition payments for the delay caused by the automatic stay and has never sought adequate protection in the form of interest on its claim or the value of the collateral. Based upon the Court's review of Foremost's Emergency Motion to Continue Order Prohibiting Use of Cash Collateral, as filed with the Court on March 23, 1988, and Foremost's Motion for Relief from Stay, as filed with the Court on May 3, 1988, it appears that Foremost never sought this form of adequate protection acknowledging in argument that it was not entitled to such. Further, based upon the Court's review of pages 6 and 7 of the Agreed Cash Collateral Order it appears that the parties never contemplated that the monthly payments were to compensate

Foremost for lost opportunity costs, but rather for adequate protection against Flagler's erosion of Foremost's secured claim through depletion of the post-petition rental revenues.[1] This turnover of excess rents was expressly agreed to and acknowledged by counsel for Flagler at the June 1, 1988 hearing resulting in the Agreed Cash Collateral Order (transcript pages 13–15, 23–24):

> MR. GENOVESE: Judge, we made an offer of adequate protection which essentially cures any defaults with respect to the first and the second mortgage, particularly the second mortgage of Capital Bank, I think, is what counsel for Foremost is concerned about. . . .
>
> The offer of adequate protection, essentially, is intended to preserve the status quo and prevent any erosion of Foremost's position on the property until [the filing of a plan].
>
> My original request of Foremost and my intention was that, look, we'll start giving you excess [rents] now, we will make payments commencing in July; in exchange for that, we want you to consider our serious proposal regarding a restructure of this indebtedness, and we will hopefully provide those in an agreed plan to be filed by August 15th. . . . .
>
> We have said we will immediately, at least by Friday, bring current the first and the second mortgages. We will make the June payments on the first and the second mortgages by June 15th. Any excess that presently exists in the debtor's accounts with respect to the operations of the property after expenses and payment of the debt service of the first and the second will be turned over to Foremost. . . .

> MR. GART: All claims in or arising out of the foreclosure that the. debtor may have will be filed as an adversary now, and the foreclosure will go forward in this Court. . . .
>
> MR. GENOVESE: Judge, I think that is fairly accurate.
>
> A couple points I'd like to address. Essentially, we are making the June payment in full which is not provided for under the previous proposal. If there is an excess accumulated after June 1, which is not a product of a previous excess of rents over expenses, we would like to accumulate it, or make the full payment while acknowledging it is cash collateral.
>
> We have not addressed that, and that—
>
> MR. GART: Well, if they are willing to acknowledge that it is our cash collateral, then we have no problem with that.
>
> MR. GENOVESE: All right. Other than that, the only dispute was whether we would have essentially a standstill in the [foreclosure] litigation. . . .

Regardless of whether the post-petition payments at issue here are called "adequate protection payments", "interest payments", "excess rents" or "debt service", none of the payments appear to have been requested for, or paid for, the delay caused by the automatic stay as prohibited by *Timbers*. This is demonstrated further by the Agreed Cash Collateral Order which also had the effect of allowing Foremost to proceed with foreclosure of the Wrap Mortgage in the related adversary proceedings before this Court.[2] Accordingly, the Court finds that the payments were not intended to be in compensation of Foremost's so-called lost opportunity costs for the delay

---

1. When a Chapter 11 debtor-in-possession is authorized to operate its business, it may use property of the estate in the ordinary course of its business. However, a debtor-in-possession is *absolutely* prohibited from using cash collateral unless a secured creditor with an interest in such collateral consents or unless the court authorizes the use of cash collateral upon such terms and conditions as may be necessary to provide adequate protection for a decline in the value of such interest. 11 U.S.C. §§ 361(1), 363(c)(2) and (e).

2. Foremost is not attempting to recast these payments as something other than interest. The record reflects that, as a payment formula for the convenience of the parties, Flagler agreed to make the full interest payment because such "adequate protection" (in the form of debt service for Sunbeam and Capital, and the balance to Foremost) was running at an amount approximately equal to the monthly net rental income.

caused by the automatic stay in fore-closing. *See Matter of Kain,* 86 B.R. at 514 (because parties did not intend that the payments were to compensate for lost opportunity costs, the payments were not applied to reduce secured claim).

The correct question to address is whether Foremost, an undersecured creditor whose collateral consists of a mortgage on the Building plus a perfected interest in the post-petition rents derived therefrom, should be forced to credit post-petition payments received from the debtor to the secured portion of its claim. The Court concludes that the only legal outcome is that the payments are not to be credited.

As demonstrated by the Agreed Cash Collateral Order and the Foreclosure Judgment, this Court has twice concluded that Foremost's Wrap Mortgage constitutes a valid lien upon the Building along with the rents, security deposits, tax escrows, insurance escrows and other personal property. The Foreclosure Judgment states that "Foremost's lien shall hereby be deemed to extend to all other forms of cash and proceeds held by Flagler, including rents, issues and profits from the Building and any escrow accounts for insurance, taxes and security deposits. The above shall constitute cash collateral of Foremost within the meaning of 11 U.S.C. § 363(a)."

As indicated, Flagler has acknowledged that Foremost is the only secured creditor and mortgagee under the Wrap Mortgage who also has a perfected interest in the post-petition rents derived from the Building. *See, e.g., In re Mears,* 88 B.R. 419, 421 (Bankr.S.D.Fla.1988); and *In re Aloma Square, Inc.,* 85 B.R. 623, 625 (Bankr.M.D. Fla.1988). It is this additional post-petition lien on the Building rents and Flagler's continued use of such cash collateral to make the very post-petition payments at issue here, that sets this case apart from the authorities cited by Flagler, and is of significant importance to the Court's determination that Foremost's secured claim should not be reduced. In this case, the post-petition monthly payments were derived from the excess rents and paid as adequate protection against Flagler's erosion of the value of Foremost's secured claim; a claim which extends to the rents generated by the Building during the Chapter 11 constituting Foremost's cash collateral. This entitlement to the excess rents is entirely consistent with Sections 361(1), 363(e), and 552(b) of the Bankruptcy Code as well as the Supreme Court's statement in *Timbers* that adequate protection would still be available to the undersecured creditor whose collateral was declining in value while the stay is in effect.

It was explicitly agreed at the June 1, 1988 hearing that the net operating income or "excess rent" from the Building would be paid over to Foremost as adequate protection. Flagler cannot contend that its use of cash collateral did not erode the value of Foremost's secured claim. Consistent with Sections 502(b) and 552(b) of the Bankruptcy Code, Foremost's secured claim consists of its subordinate interest in the value of the Building as of the commencement of the case, plus the rents as cash collateral generated thereby during the Chapter 11. *Cf. In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 826 (Bankr.S.D.N.Y.1982) (recognizing that the value of a secured claim which also encumbers rents was increasing by the unspent rental income accumulating in accounts); and *In re Timbers of Inwood Forests Associates, Ltd.,* 793 F.2d 1380, 1412 n. 57 (5th Cir.1986), *aff'd, United Savings Association of Texas v. Timbers of Inwood Forests Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (collecting supporting cases, including *Pine Lake,* expressing the view that an undersecured creditor is "entitled only to protection against a decline in the value of its collateral through use, decay or depreciation"). The post-petition payments made by Flagler were not intended to protect Foremost's interest in any noncash collateral. The post-petition payments only afforded 11 U.S.C. § 361(1) protection against the erosion of Foremost's secured claim with respect to Foremost's interest in the cash collateral derived from the Building.

In its reply memorandum Flagler asks a somewhat misleading, but otherwise valid, question: "If the Building and its rent are

intended to collateralize Foremost's secured claim, isn't it the case that such payments from the collateral are intended to repay either interest on such claim, or reduce the principal balance of such claim?" In asking the question, Flagler incorrectly assumes that no decline in the value of the collateral has been suggested. Further, the answer to the question is *yes*, the post-petition payments are to be applied to principal, *after* taking into account that Foremost's secured claim includes the excess rents generated and paid to Foremost during the Chapter 11. 11 U.S.C. § 552(b). Flagler's position totally ignores Foremost's rights to these rents. The result is essentially a "wash" in that the additional collateral value represented by the excess rents is to be set-off by the fact that Foremost has already received them during the course of the Chapter 11. No further reduction of the Foremost secured claim is appropriate.

Flagler argues that the value of any income producing property, such as the Building at issue, is always determined in part based on the rental income to be generated therefrom and that the Court's Valuation Order takes future rental income from the date of the petition into account in fixing the value of Foremost's secured claim as of the commencement of the case. In its reply memorandum Flagler correctly points out that in valuing the Building the Court considered evidence with respect to both the amount of rents on hand at any given time and the Building's income stream. Further, the Valuation Order, in addition to valuing the Building at $9 million, did also determine that the applicable date for valuing the Building was the commencement of the case and found no significant changes in the value of the Building since that date. From all this, Flagler unpersuasively argues that the Valuation Order is now *res judicata* to Foremost's position, pursuant to Section 552(b), that its secured claim can not be reduced by the "excess rents" generated during the Chapter 11 and paid to it. Clearly, the legal and factual issues which Flagler seeks to be precluded from relitigation are not identical to the issues litigated in the prior valuation hearing, nor could they have been litigated. *See e.g., I. A. Durbin, Inc. v. Jefferson National Bank*, 793 F.2d 1541 (11th Cir. 1986). While more properly a question of "issue preclusion" or collateral estoppel, the only matters at issue at the valuation hearing were the value of the Building as of the commencement of the case and the valuing of secured claims as of such date pursuant to Section 502(b) of the Code. The issue of Foremost's ultimate entitlement to the post-petition rents derived from the Building under Section 552(b) of the Code was not at stake in the valuation of its claim as of the commencement of the case. *Id.* at 1549 (citing *Greenblatt v. Drexel Burnham Lambert, Inc.*, 763 F.2d 1352, 1360 (11th Cir.1985); *Precision Air Parts, Inc. v. Avco Corp.*, 736 F.2d 1499, 1501, 1504 (11th Cir.1984)).

If, *arguendo*, Flagler had not been given Foremost's consent or Court approval to use the rents in the operation of the Building, conditioned upon the post-petition payments to Foremost, there would be at least approximately $440,000 in segregated excess rents which would still constitute Foremost's cash collateral and a portion of its lien. These monies would therefore have to be taken into account and added to the value of Foremost's secured claim which is otherwise determined by the value of its remaining collateral as of the commencement of the case (i.e., the Building, including the future projected income therefrom). 11 U.S.C. § 502(b); *In re Executive House Associates*, 99 B.R. 266, 278–82 n. 25 (Bankr.E.D.Pa.1989) (anticipated rental income always considered in determining value). What Flagler suggests is to simply cutoff Foremost's rights under Section 552(b) and limit its secured claim as to the value of the Building without accounting for Foremost's lien on the excess rents generated during the course of the Chapter 11. In the process Flagler would also have the Court deduct the post-petition payments of approximately $440,000 from the secured portion of Foremost's claim. To allow a reduction of Foremost's secured claim on such a basis would preclude this Court from later finding that Foremost,

even as an undersecured creditor, will ultimately realize the value of all its collateral. *Timbers,* 108 S.Ct. at 633; and 11 U.S.C. § 1129(b)(2)(A)(i). *See also Sherwood Square,* 87 B.R. at 394; and *Matter of Kain,* 86 B.R. at 513.

Again, the fundamental support for this result is the *Timbers* decision itself. Even an undersecured creditor such as Foremost has the right to receive protection for any decline in the value of its collateral during the automatic stay. Approximately $1.6 million in Chapter 11 rents have been depleted by Flagler in the operation of the Building after payment of debt service to Sunbeam and Capital and the post-petition payments of excess rents to Foremost. This cash collateral is gone, no longer available and constitutes an erosion of Foremost's security during the Chapter 11 case. Thus, a portion of its collateral as to which it has a continuing lien pursuant to Section 552(b) of the Bankruptcy Code (i.e., the cash collateral) has decreased in value. Applying *Timbers* to these circumstances, Foremost was entitled to receive post-petition payments as adequate protection for the erosion of the total value of its cash collateral. In fact, Foremost has only received approximately $440,000, far less than the total of the cash collateral depleted by Flagler during the Chapter 11. However, the Agreed Cash Collateral Order and the formula for the payments thereunder was reached on an agreed basis and the "excess rents" were all that was available for adequate protection against Flagler's erosion of the value of all the cash collateral generated during the Chapter 11. *Timbers,* 108 S.Ct. at 629–30. *See also, General Electric Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.),* 25 B.R. 987, 994 (Bankr.D.Utah 1982) (as relied upon in the Fifth Circuit's Opinion *In re Timbers,* "adequate protection was protection ... against depreciation of the collateral when it erodes the allowed secured claim").

Further, while Flagler's argument that the $9 million valuation for the Building as of the commencement of the case includes future rental income is generally speaking true, it is an argument which remains in-

consistent with the Court's Valuation Order which only valued the claims as of the commencement of the case without consideration of the operation of Section 552(b) of the Bankruptcy Code. Although Flagler cites *Timbers* for a contrary result, the Supreme Court in *dicta* did discuss possession of a perfected security interest in post-petition rents and the basis for the exception at issue in this case:

Second, petitioner's interpretation of § 362(d)(1) is structurally inconsistent with 11 U.S.C. § 552. Section 552(a) states the general rule that a prepetition security interest does not reach property acquired by the estate or debtor post-petition. Section 552(b) sets forth an exception, allowing post-petition 'proceeds, product, offspring, rents, or profits' of the collateral to be covered only if the security agreement expressly provides for an interest in such property, and the interest has been perfected under 'applicable nonbankruptcy law'. *See, e.g., In re Casbeer,* 793 F.2d 1436, 1442–1444 (CA5 1986); *In re Johnson,* 62 B.R. 24, 28–30 (CA9 Bkrtcy.App.1986); *cf. Butner v. United States,* 440 U.S. 48, 54–56, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979) (same rule under former Bankruptcy Act). *Section 552(b) therefore makes possession of a perfected security interest in postpetition rents or profits from collateral a condition of having them applied to satisfy the claim of the secured creditor ahead of the claims of unsecured creditors. Under petitioner's interpretation, however, the undersecured creditor who lacks such a perfected security interest in effect achieves the same result by demanding the 'use value' of his collateral under § 362.* It is true that § 506(b) gives the *over*-secured creditors, despite lack of compliance with the conditions of § 552, a similar priority over unsecured creditor, but that *does not* compromise the principal of Section 552, since the interest payments come only out of the 'cushion' in which the oversecured creditor does have a perfected security interest.

*Timbers,* 108 S.Ct. at 631–32 (emphasis added). Again, the Court finds that Fore-

most was never put in the position of "demanding the 'use value' of [its] collateral under § 362," as it never lacked a perfected security interest in the post-petition rents of the Building. *Id. See also In re Multi–Group III Limited Partnership,* 99 B.R. 5, 11 (Bankr.D.Ariz.1989) (§ 552(b) construction consistent with *Timbers,* as claim for rents based on a perfected security interest is different than a claim for "use value" of the collateral and the same concerns for equity of distribution are not implicated); and *In re DeFranco,* 93 B.R. 307, 308–09 (Bankr.D.D.C.1988) (operation of § 506 does not make § 552(b) inapplicable). Foremost needed only to rely on the Agreed Cash Collateral Order and Sections 361(1), 363(e) and 552(b) of the Bankruptcy Code. This result has also received the reluctant support of a principal draftsman of the Bankruptcy Code who has otherwise criticized those arguments which take into account a fluctuation in the value of an undersecured creditor's collateral during the pendency of the Chapter 11 case:

> But if the collateral increases in value does the allowed secured claim of the undersecured or marginally secured creditor increase as well? Certainly to the extent the increase constitutes net proceeds, product, offsprings, rents or profits in which the creditor has a perfected security interest, the allowed secured claim will increase except to the extent the collateral has been depleted or the equities of the case otherwise require. 11 U.S.C. § 552(b). *See, e.g., In re Dahlquist,* 34 B.R. 476, 483 (Bankr.D.S.Dak. 1983). Beyond the express language of § 552(b), it is doubtful whether the increase in value of the collateral increases ... the allowed secured claim of the undersecured creditor....

K. Klee, "Timbers, Ahlers and Beyond." *62nd Annual Meeting of the National Conference of Bankruptcy Judges,* October, 1988 at p. 422.

Given Foremost's reliance on the Agreed Cash Collateral Order and the correct analysis to be applied under *Timbers* and Section 552(b) of the Bankruptcy Code, the Court concludes that Foremost had a right to receive the excess rents from the Building during the pendency of the Chapter 11 case and that Flagler is not entitled to a reduction of Foremost's secured claim for the payments made.

Flagler cites *In re Sherwood Square Associates,* 87 B.R. 388 (Bankr.D.Md.1988) and *In re Canaveral Seafoods, Inc.,* 79 B.R. 57 (Bankr.M.D.Fla.1987) in support of its argument for a reduction of Foremost's secured claim. The two cases address only the issue of post-petition payments made for the delay of the creditor's foreclosure rights arising from the automatic stay. Moreover, the cases are distinguishable in that neither involves an undersecured creditor with a perfected interest in post-petition rents as additional collateral receiving the post-petition payments from the proceeds of such additional collateral. Accordingly, neither case addresses the Section 552(b) and cash collateral issues before this Court, and are therefore not persuasive. A review of the applicable case law cited by Foremost, as applied to the facts present in this case, shows that, where the proceeds for the post-petition payments come from an undersecured creditor's cash collateral as to which there is a perfected post-petition lien, such payments cannot later be applied to reduce the secured portion of the undersecured creditor's claim. *In re Maun,* 95 B.R. 94, 96 (Bankr.S.D.Ill.1989).

Again, the Court has previously found the value of the Building is $9 million. The Court still has not been provided with direct evidence with regard to the specific amount of the Sunbeam indebtedness nor the Capital indebtedness. Accordingly, Foremost's secured claim, for purposes of Flagler's Amended Plan of Reorganization, shall be the difference between the total of the Sunbeam and Capital secured claims and $9 million and it is subordinate to both of those secured claims. The Court shall continue to retain jurisdiction to enter appropriate orders fixing the precise amount of the Sunbeam, Capital and Foremost claims.

DONE and ORDERED.