**CONFEDERATION LIFE INSURANCE CO., Appellant,**

v.

**BEAU RIVAGE LIMITED, Appellee.**

**Civ. A. Nos. 1:90–cv–2369–HTW, 1:90–cv–2370–HTW.**

United States District Court, N.D. Georgia, Atlanta Division.

March 29, 1991.

Grant Thomas Stein, Alston & Bird, Atlanta, Ga., for appellant.

James Craig Cifelli, Lamberth Bonapfel Cifelli & Willson, Atlanta, Ga., for appellee.

## MEMORANDUM OPINION

HORACE T. WARD, District Judge.

Creditor, Confederation Life Insurance Co., appeals from the bankruptcy court's final order of October 11, 1990 confirming the plan in the Beau Rivage Limited Chapter 11 bankruptcy case, and the underlying orders of October 4, June 28 and May 2, 1990.

The appeal is pursuant to 28 U.S.C.A. § 158(a) which grants this court jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges entered in cases which have been referred to the bankruptcy judges under 28 U.S.C.A. § 157.

## I. STATEMENT OF THE CASE

### A. *Background Facts*

Beau Rivage Limited's ("Beau Rivage") sole asset is the Beau Rivage Apartments ("the Apartments") overlooking the Chattahoochee River in Roswell, Georgia. The Apartments, over twenty years old, consist of 409 units in thirty-seven buildings. Beau Rivage has 329 limited partners holding 566 outstanding partnership units. Beau Rivage's general partners are Richard R. Felker, John J. Cross, and RFC Realty, Inc., a corporation wholly owned by Mr. Felker.

Beau Rivage purchased the Apartments in 1981. At the time of the purchase, the limited partners of the debtor had invested approximately $5,250,000. On May 6, 1986, Beau Rivage sought refinancing of the property and entered a non-recourse secured lending arrangement with Confederation Life Insurance Co. ("Confederation Life") to obtain a $9,800,000 loan. The loan was payable over 20 years at Confederation Life's prime lending rate of $9\frac{7}{8}\%$, and secured by a first priority security deed on the property and its proceeds.

From 1986 until recently the Apartments were the subject of severe waste and deterioration as a result of a serious water penetration problem. At the time of the refinancing, eighteen of the apartment

units were out of service because of the deterioration, and the apartments were at 82% occupancy.

During 1988 and 1989 the Apartments did not generate enough revenue to service Beau Rivage's debt and to operate the property. As a result, Mr. Felker and Mr. Cross loaned approximately $991,000 as needed to supplement income and meet the mortgage and other expenses. The deterioration problem continued. By Autumn of 1989, 64 units were out of service. In October of 1989, Mr. Felker advised Confederation Life about the deterioration problem and the accompanying drop in occupancy levels and suggested a mortgage moratorium comprised of reduced mortgage payments and reinvestment of excess revenues in repairs. Beau Rivage withheld the October mortgage payment in its entirety, and Confederation Life ordered two renovation and repair analyses.

In November 1989, Confederation Life declared Beau Rivage to be in default, accelerated the unpaid balance of the promissory note, and stated its intention to seek a state court receiver. Beau Rivage filed its voluntary Chapter 11 petition soon thereafter.

## B. *Proceedings in Bankruptcy Court*

The Chapter 11 petition was filed on November 29, 1989, and Confederation Life filed a proof of claim for $11,001,455. On April 11, 1990, the bankruptcy court authorized Beau Rivage to use cash collateral to operate and renovate the apartment complex and ordered Beau Rivage to pay to Confederation Life half of its $85,099 monthly mortgage payment for the months of February and March and full mortgage payments for each month thereafter as adequate protection for use of the cash collateral.

On May 2, 1990, the bankruptcy court entered an order valuing the property at $9,300,000, approving Beau Rivage's separate classification of three parties to exec-

utory contracts and setting a pre-confirmation deposit requirement of $200,000 on or before June 18, 1990. Confederation Life moved to alter and amend the May 2, 1990 order, claiming that the valuation did not take into account its security interest in post-petition rents. The bankruptcy court denied the motion.

The bankruptcy court's valuation was based on its finding that there had been no accumulation of rents and the $9,300,000 valuation reflected reinvestment of rents and revenues and also the fact that Confederation Life had received adequate protection payments for the use of its rents and revenues which totaled $340,396 as of June 28, 1990.[1]

After filing, Beau Rivage had budgeted $366,000 to make the necessary structural and cosmetic repairs. As of June 28, 1990 it had spent $250,000 and the structural problems were corrected by March 6, 1990. It did not budget any additional funds for extra property upgrade for the years 1990 through 1994.

At the time of the October 4, 1990 order, the bankruptcy court found that Beau Rivage had reduced the number of out-of-service apartments from sixty-four to nine, had increased physical occupancy from 81% to 88%, and had increased monthly revenues from approximately $135,000 in December 1989, to approximately $160,000 in June 1990. The bankruptcy court found that the new rentals were made at a below-market rate, so that the economic occupancy rate was approximately 80%, and the resident turnover at the apartment complex was approximately 100%.

Confederation Life now appeals the bankruptcy court's final order of October 11, 1990 confirming the plan and the underlying orders of October 4, June 28 and May 2, 1990.

## C. *The Reorganization Plan*

Beau Rivage filed the reorganization plan at issue and its disclosure statement

---

**1.** The valuation amount constitutes the allowed secured claim of Confederation Life under 11 U.S.C.A. § 506. According to the ballots of Confederation Life, the claim is $9,953,474. Con-

federation Life has filed a proof of claim in the amount of $11,001,455. The difference is based on a pre-payment premium not being included in the ballot amount.

on April 27, 1990. The plan consists of several classes. Class 1 is comprised of claims for wages, employee benefits, and taxes (other than *ad valorem* taxes) which are entitled to priority under §§ 507(a)(3), (4), (5) and (7) of the Bankruptcy Code. Class 2 consists of the principal and interest due on *ad valorem* taxes against the debtor's property. Beau Rivage proposes to pay any such claims under these classes in full.

Class 3 consists of the claims of Confederation Life and its claim is listed as $9,953,474. In satisfaction of this debt, the plan provides for payments to Confederation Life under the terms of the original refinance note at $85,099 per month over the remaining 16 years of the agreement and under an arrearage note representing previously unpaid mortgage payments, interest, late fees and attorneys' fees, to be amortized over the same loan term as the original note. The payments are to be made at the contract interest rate of $9\frac{7}{8}\%$. The protection payments made pursuant to the April 11, 1990 order are to be applied in place of the first four installments under the original note.

Class 4 consists of all claims against Beau Rivage which are not in any other class, and generally includes all unsecured trade creditors. The plan proposes to pay off these claims with 6% interest in three installments.

Class 5 consists of the claims of partners and affiliates which are to be paid in full only after the class 1, 2, and 4 claims have been paid and after Confederation Life's arrearage note has been paid. Class 6 is comprised of equity interests of the general and limited partners. They will retain their interests and will receive distributions only when classes 1, 2, 4, and 5 claimants are paid in full and Confederation Life's arrearage note is paid.

Classes 7, 8 and 9 consists of claims arising out of executory contracts such as furniture rental, pest control and lawn care services. The plan proposes to pay off these claims in the same way that class 4 debts are paid and proposes to assume their contracts.

Finally, the plan proposes to make an offering of "New Capital Debt" to its limited partners in the original principal amount of $500 and payable with interest ten years after their issuance. If Beau Rivage fails to raise at least $320,000 within four months of the effective date of the plan, Confederation Life may declare Beau Rivage to be in default of its obligations under the original note. At the time of the bankruptcy court's October 4, 1990 order, Beau Rivage had already solicited $327,000 from the limited partners under this provision, and anticipated a maximum of $500,-000 to be raised by this method.

Confederation Life voted to reject the plan. It also purchased claims of several unsecured creditors with debts totaling $41,097.89 and voted these claims against the plan. The six unsecured creditors holding claims totaling $4,315.49 who did not sell their claims to Confederation Life voted to accept the plan but were outnumbered by the dissenters, and as a result, Class 4 rejected the plan. The Class 6 equity interests voted in favor of the plan, as did Classes 7, 8 and 9. The bankruptcy court found that the other classes were not impaired and therefore did not have a meaningful vote.

### D. *The Confirmation Hearing*

On June 28, 1990, the bankruptcy court held a confirmation hearing on the plan. Confederation Life raised objections to confirmation which are addressed in more detail below. As reflected in its October 4, 1990 order, the bankruptcy court found that, as a matter of law, there was no impaired accepting class, the plan was fair and equitable, feasible, and proposed in good faith.

## II. DISCUSSION

### A. *Standard of Review*

This Court's standard of review with regard to determinations of law made by the bankruptcy court is *de novo*. The "clearly erroneous" standard of review applies with regard to the bankruptcy court's factual determinations. *See, In re Sublett*, 895

F.2d 1381, 1384 (11th Cir.1990); *In re Thomas*, 883 F.2d 991, 994 (11th Cir.1989); Bankr.Rule 7052 (incorporating Fed.R. Civ.P. 52); Bankr.Rule 8013.

The district court functions as an appellate court in reviewing the bankruptcy court's decision. See 28 U.S.C.A. § 158(a), (c). The district court is not authorized to make independent factual findings; that is the function of the bankruptcy court. See Bankr.Rules 7052, 8013; *In re Sublett*, 895 F.2d at 1384; *Wegner v. Grunewaldt*, 821 F.2d 1317, 1320 (8th Cir.1987).

### B. *The Cramdown Interest Rate*

■ The first issue on appeal is whether the bankruptcy court applied the correct cramdown rate in confirming a reorganization plan under Chapter 11 of the Bankruptcy Code. Confederation Life objects to the bankruptcy court's order of confirmation insofar as the order fixes the interest rate that is paid Confederation Life at 9⅛% (the contract rate) rather than the prevailing market rate for purposes of "cramdown" under 11 U.S.C.A. § 1129(b)(2)(A)(i)(II).[2]

The plan at issue here did not provide for immediate payment in cash of Confederation Life's claim. Because Confederation Life opposed the plan, the bankruptcy court, at debtors' request, invoked the "cramdown" provisions of Chapter 11 to confirm the plan. 11 U.S.C.A. § 1129(b). Under Chapter 11 "cramdown" provisions,

the bankruptcy court could take evidence regarding various prevailing interest rates. The bankruptcy court could then make applicable to the scheduled deferred payments due Confederation Life under the plan whatever rate of interest would insure that Confederation Life eventually would receive the value of the amount that had been owed on the date the plan was confirmed. 11 U.S.C.A. § 1129(b)(2)(A)(i)(II).[3]

The appropriate interest rate was a question of fact to be determined by the bankruptcy court and this court cannot set that decision aside unless it was clearly erroneous. *In re Greenbrook Carpet Co.*, 722 F.2d 659, 660–61 (11th Cir.1984) (determinations of "reasonably equivalent value" under 11 U.S.C.A. § 548(a)(2)(A)).

Under § 1129(b)(2)(A)(i)(II), deferred cash payments due Confederation Life must total "a value, as of the effective date of the plan, of at least the value of [Confederation Life's] interest in" the collateral. Since Confederation Life's loan was accelerated, Confederation Life had a right at the date the plan became effective to the unpaid principal plus any interest that had accrued up until that time. The task of the bankruptcy court was to determine what rate of interest would ensure Confederation Life ultimately receives the full value of that amount, given that the plan provided for level amortized payments over a 16 year period.

---

**2.** Section 1129(b)(1) provides that before claims of a dissenting class of secured creditors may be "crammed down" by confirmation of a plan, the bankruptcy court must conclude that the plan "does not discriminate unfairly, and is fair and equitable." 11 U.S.C.A. § 1129(b)(1). The "fair and equitable" standard includes the requirement under § 1129(b)(2) that the creditor receive the full value of his claim. "Fair and equitable" is a term of art, and means, among other things, that the plan must assure each creditor's claim is given appropriate priority. *See, e.g., In re King Resources Co.*, 651 F.2d 1326, 1340 (10th Cir.1980).

**3.** 11 U.S.C.A. 1129(b) provides that a bankruptcy court shall, at the request of the debtor, confirm a chapter 11 plan over the objections of a class of secured creditors if the plan does not discriminate unfairly, and is fair and equitable, with respect to such [dissenting class] if:

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the lien securing such claims, whether the property subject to such lien is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class *receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.*

11 U.S.C.A. § 1129(b)(2)(A)(i)(I)–(II) (emphasis added).

The parties dispute the application of *In re Southern States Motor Inns, Inc.*, 709 F.2d 647 (11th Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984) where the Eleventh Circuit considered the rate of interest to be applied under § 1129(a)(9)(C) pertaining to delinquent federal tax claims. The Eleventh Circuit considered the phrasing "value, as of the effective date of the plan" as found throughout the bankruptcy code including the provision at issue here. The court determined that that phrasing was meant to ensure that those who would receive "payments over time would receive deferred payments equivalent to the present value of their claims," 709 F.2d at 650, accomplished in this situation by charging the debtor interest on a claim for unpaid taxes based on the prevailing market rate rather than on the statutory rate of 12% found in 26 U.S.C.A. § 6621. 709 F.2d at 651.

In the present case the bankruptcy court declined to apply the market rate. The bankruptcy court reviewed the law on the issue and concluded that, rather than applying a blanket market rate rule for all circumstances, courts have addressed the issue on a case-by-case basis and some have used the original contract rate of interest when assessing the present value requirement under the Bankruptcy Code.[4] The court cited *In re Club Associates*, 107 B.R. 385, 402 (N.D.Ga.1989) (market rate is not determinative but is relevant in determining interest rate); *In re Corley*, 83 B.R. 848, 853 (S.D.Ga.1988); *In re Patel*, 21 B.R. 101, 105 (M.D.Fla.1982) (negotiated contract rate is more persuasive than rate determined by money market or other sources of financial data).

The court's own inquiry reveals cases which apply every measure of interest rate from that set forth in the original contract between the parties, *In re Colegrove*, 771 F.2d 119 (6th Cir.1985) (Chapter 13, con-

tract rate is maximum rate); *In re Cooper*, 11 B.R. 391, 395 (N.D.Ga.1981); *In re Mitchell*, 77 B.R. 524 (E.D.Pa.1987) (contract rate is maximum rate); *In re Smith*, 4 B.R. 12, 13 (E.D.N.Y.1980), to the legal rate of interest, *In re Johnston*, 44 B.R. 667, 670 (W.D.Mo.1984); *In re Coburn*, 36 B.R. 550, 551 (W.D.Mo.1983); *In re Anderson*, 28 B.R. 628, 632 (S.D.Ohio 1982); *In re Crockett*, 3 B.R. 365, 368 (N.D.Ill.1980), to the market rate of interest, *Memphis Bank and Trust Company v. Whitman*, 692 F.2d 427, 431 (6th Cir. 1982); *In re S.E.T. Income Properties, III*, 83 B.R. 791, 793 (N.D.Okla.1988); *In re Konzak*, 78 B.R. 990 (N.D.1987) (Chapter 12 case); *In re Doud*, 74 B.R. 865 (S.D. Iowa 1987) (Chapter 12 case); *In re Trigwell*, 67 B.R. 808 (C.D.Cal.1986) (Chapter 13 case); *In re Mitchell*, 39 B.R. 696, 700–02 (D.Or.1984) (interest on delinquent taxes under § 1129(a)(9)(C)).

The bankruptcy court found that the contract rate of 9⅞% interest was appropriate because: 1) there is little difference between the contract rate and today's prime market rate of approximately 10%; 2) any difference between that rate and Confederation Life's proposed 14.7% rate can be attributed to Confederation Life's adjustments for risk of default and quality of the security; 3) Confederation Life knew (or should have known) of the deteriorating condition of the property and the corresponding risks when it first offered the loan and asked for interest at its "prime" rate of 9⅞%; 4) since the occupancy rate and the number of occupied units have correspondingly decreased, the proposed 14.7% rate would be unjust and provide Confederation Life with a windfall;[5] and 5) because the present value of the deferred payments at the 9⅞% interest rate is more than enough to pay Confederation Life's claim in full, that rate is fair and equitable.

**4.** Beau Rivage contends that the bankruptcy court did utilize a market rate analysis and considered the contract rate as evidence of the market rate. The court's review of the bankruptcy court's October 4, 1990 Order indicates that the bankruptcy court used the contract rate in lieu of the market rate but found no essential difference.

**5.** "To allow the creditor to profit from the filing would be totally inequitable to the debtor by placing an additional financial burden on him and penalizing his efforts towards rehabilitation." *In re Corley*, 83 B.R. 848, 850 (Bankr.S.D. Ga.1988).

Under the facts of this case, the analysis of the bankruptcy court rather convincingly demonstrates that a market rate approach is not the exclusive means of insuring that Confederation Life receive the value of the amount owed on the date the plan was confirmed. The *Southern States* decision was predicated upon the statutory requirement that creditors receive the value of the debt owed as of the effective date of the plan. The Eleventh Circuit in *Southern States* addressed § 1129(a)(9)(C) pertaining to delinquent federal tax claims rather than the type of secured creditor situation presented here.

■ Confederation Life argues that the adoption of the contract rate by the bankruptcy court was an effort to limit the parties to their contractual obligations. The court's review of the record indicates only that the bankruptcy court considered the contract rate as relevant evidence in determining the present value of Confederation Life's claim.

The bankruptcy court found that the risks at filing had been lessened from the time of the original loan, thus affecting the present value of Confederation Life's secured claim. The court will not disturb that finding. There is no indication that the bankruptcy court was attempting to reinstate the debt or using the contract rate as the applicable interest rate in all cases. Instead, the bankruptcy court determined present value by utilizing the contract rate, in the context of the original and current risks, to determine the rate for the proposed payout. The present value of a secured claim must necessarily include the nature of the transaction, the risks involved in the debtor and the collateral, and the profit expectations of the creditor. These elements are also implicit in any consideration of a prevailing market rate.

> The purpose of the present value requirement is to place the holder of an allowed secured claim in the same position; economically as if the debtor exercised the option of surrendering the collateral.

Through the payment of interest, the creditor is compensated for the delay in receiving the amount of the allowed secured claim which would be received in full immediately upon confirmation if the collateral were liquidated and the capital returned to the creditor's lending business.

*In re Corley*, 83 B.R. at 850. The bankruptcy court's found that the 9⅞% rate, in the context of the original and current risks, would place Confederation Life in the same position as if it had exercised the option of surrendering the collateral.

The court holds that the bankruptcy court's method for determining the interest rate was legally and factually adequate to give Confederation Life deferred payments equal to the present value of its claim and was therefore not erroneous. The court thus affirms the bankruptcy court on this issue.

### C. *Adequate Protection*

■ Confederation Life contends that the bankruptcy court erred in applying pre-confirmation adequate protection payments for use of rents against post-confirmation plan obligations. Alternatively, Confederation Life contends that the bankruptcy court erred in undervaluing the secured claim of Confederation Life by refusing to take into consideration pre-confirmation rents under 11 U.S.C.A. § 552. The findings of the bankruptcy court concerning adequate protection payments are subject to the "clearly erroneous" standard of review. *In re George Ruggiere Chrysler–Plymouth, Inc.*, 727 F.2d 1017, 1019 (11th Cir.1984).

The plan provides for payments to Confederation Life under both the original note, in monthly installments of $85,099.00, and an arrearage note.[6] The plan applies all adequate protection payments prior to confirmation to the amounts to be paid under the original note. The practical re-

---

**6.** The arrearage note represents the sum of the previously unmade mortgage payments, inter-

est, late fees, and allowed attorney's fees.

sult is that Beau Rivage will make no cash outlays to Confederation Life during the first five months of the implementation of the plan, except in respect to the arrearage note and the unsecured Class 4 claims purchased by Confederation Life.

▪ The bankruptcy court recited the applicable law that, although undersecured creditors are not entitled to adequate protection to compensate for lost opportunity value,[7] they may receive adequate protection payments to guard against the possible devaluation of collateral during the reorganization process.[8] If the collateral does not depreciate and the payments are therefore not necessary to compensate the creditor, they may be applied toward the deferred payments in a Chapter 11 plan.[9] However, if the collateral does depreciate, the application of adequate protection payments to payment obligations under the plan would give the debtor "double credit" and would deny the creditor the compensation to which it is entitled.

Confederation Life objected to the plan's proposed allocation toward the first four payments to Confederation Life the previously made adequate protection payments. Confederation Life contends that the bankruptcy court overlooked its separate security interest in the rents which have been "depleted." Confederation Life offers *In re Flagler–At–First Assoc., Ltd.,* 114 B.R. 297 (S.D.Fla 1990) for the proposition that adequate protection payments could not be used to decrease the amount of the creditor's secured claim in the property or the rent payments of that property.

In *Flagler,* a creditor held a security interest in an apartment building and in the post-petition rents generated by the apartment building. Pursuant to a cash collateral order, the debtor was authorized to use these rents for the continued operation of the building and was ordered to pay adequate protection payments to the creditor. The bankruptcy court held that the debtor's depletion of the rents caused the value to the creditor's collateral to depreciate, that the debtor's adequate protection payments compensated it for this loss of value, and that the payments could not be used to decrease the amount of the creditor's secured claim.

The bankruptcy court found the facts present here to be very similar to those in *Flagler.* However, the bankruptcy court found that the present case was distinguishable because *Flagler* did not take into consideration the possible increase in value of the primary collateral[10] as a result of the infusion of rent proceeds[11] and that, in this case, if not for Beau Rivage's reinvestment of rents into the apartment complex, the value of the apartment complex (and the corresponding security interest) would have been much lower than the $9,300,000 appraisal. Since the rents were used for structural and cosmetic repairs, thereby increasing the occupancy and income of the apartments and making the property more valuable, Confederation Life's security was not depleted. Instead, "[d]ebtor's use of the rents transferred value from one source of collateral to another, and this was reflected in the valuation order." October 4, 1990 order p. 7.

7. Citing, *United Savings Assoc. of Texas v. Timbers of Inwood Forest Assocs. Ltd,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

8. Citing, *In re Club Assocs.,* 107 B.R. 385, 394 (Bankr.N.D.Ga.1989); *In re Sherwood Square Assocs.,* 87 B.R. 388, 394 (Bankr.D.Md.1988).

9. Citing, *Sherwood Square Assocs., Id.,* at 394.

10. Confederation Life does not challenge the bankruptcy court's determination that the Apartments constituted the "primary collateral."

11. *Flagler* is also distinguishable on other grounds. In *Flagler,* the court accepted that the

creditor's collateral was declining in value. However, in *Flagler* the court had more of an indication of how the parties intended that the payments be treated. *Flagler's* attorneys expressly agreed to a turnover of excess rents to "preserve the status quo and prevent any erosion of [the creditor's] position on the property." *Id.* at 300. It appears that the parties in *Flagler* contemplated that the payments would go to protect the creditor's interest and not to reduce the principal owed on the debt. *Flagler's* attorney further stated that "we'll start giving you excess [rents] now ..., in exchange for that, we want you to consider our serious proposal regarding a restructure of this indebtedness." *Id.*

Adequate protection[12] is addressed in § 361 which states:

> When adequate protection is required under section 362, 363 or 364 of this title of an interest of an entity in property, such adequate protection may be provided by —(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the use, sale or lease under section 363 of this title ... results in a decrease in the value of such entity's interest in such property; (2) providing to such entity an additional or replacement lien to the extent that such ... use, sale [or] lease ... results in a decrease in the value of such entity's interest in such property; or (3) granting such other relief ... as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C.A. § 361 (1988).[13]

■ Once a creditor is subject to the automatic stay, it can receive adequate protection under § 361. These payments can be interest payments or can reduce the principal on a debt owed, among other things. However, an undersecured creditor whose collateral is not depreciating cannot receive interest on its collateral during the stay to assure adequate protection.

Confederation Life presents a sophisticated and well-reasoned argument that the bankruptcy court's analysis resulted in a "double credit" for Beau Rivage when it permitted the accumulated post-petition rents to be decreased when applied to the property. Confederation Life argues that it is entitled to adequate protection for this decrease.

■ However, the court cannot adopt Confederation Life's argument. To do so would lead to a result inconsistent with *United Savings Assoc. v. Timbers of Inwood Forest Associates, Ltd,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), where the Supreme Court held that an "interest in property" protected by § 362(d)(1) allowing an undersecured creditor relief from a stay on the ground of adequate protection does not include a creditor's right to immediate foreclosure, or interest on its collateral as compensation for the delay caused by the automatic stay.[14] Where, as here, a creditor is undersecured and the property is not depreciating in value, the creditor is not entitled to adequate protection payments. Whether the allegation is that the payments are adequate protection payments, interest payments, or lost opportunity costs, the Supreme Court in *Timbers* made it clear that an undersecured creditor whose collateral is not depreciating is not entitled to such payments. 484 U.S. at 370, 108 S.Ct. at· 629 (1988). In *Timbers,* the Court was concerned that an undersecured creditor not improve its position with respect to other creditors. *Id.* at 372, 108 S.Ct. at 630. If payments are made to an undersecured creditor, they must be allowed to reduce the allowed secured claim of the creditor. Otherwise the payments would be treated as interest payments or use value, in direct contravention of *Timbers* and § 506. *See, Timbers,* 484 U.S. at 382, 108 S.Ct. at 635; *In re Reddington/Sunarrow Ltd. Partnership,* 119 B.R. 809 (D.N.M.1990); *In re Maun,* 95 B.R. 94 (S.D.Ill.1989); *In re Kain,* 86 B.R. 506 (W.D.Mich.1988).

**12.** "Adequate protection" is not a standard the Bankruptcy Code uses in connection with confirmation decisions. Instead, the adequate protection requirements apply primarily in the context of preconfirmation proceedings. *See,* 11 U.S.C.A. § 362(d).

**13.** The legislative history to this section states that: "Adequate protection of, an interest of an entity in property is intended to protect a creditor's allowed secured claim." 124 Cong.Rec. H. 11092 (daily ed. Sept. 28, 1978); S. 17408–09 (daily ed. Oct. 6, 1978) (remarks of Rep. Edwards and Sen. DeConcini). If the secured

creditor elected application of § 1111(b)(2), then that creditor is entitled to adequate protection of his interest to the extent of the value of the collateral, not to the extent of the creditor's "allowed secured claim." *Id.*

**14.** In *Timbers* the Supreme Court determined that the phrase "value of such creditor's interest" in § 506(a) meant "the value of the collateral," and that the phrase "value of such entity's interest" in the adequate protection provisions in § 361(1) and (2), when applied to secured creditors, meant the same.

■ The bankruptcy court found, after several hearings and an inspection of the property, that the property did not deteriorate during the pendency of the bankruptcy action and that post-petition structural and cosmetic repairs and renovations increased the value of the Apartments, thus increasing the value of Confederation Life's primary collateral, and the value of the property as reflected in its valuation order. The court has reviewed the record and can discern no error in these determinations.

■ While the court agrees that Confederation Life has a perfected security interest in both the real property and the rents, the bankruptcy court was correct in its determination that the application of the rents to the property was a transfer of value. The value simply shifted from one form of collateral to another. There was no depletion. Under the evidence presented to bankruptcy court, this court can find no clear error in the bankruptcy court's determination that "the Property's value (and the corresponding value of Confederation's security interest in the property) would have been much lower than the $9,300,000 appraisal," October 4, 1990 order. p. 7.

Accordingly, the court finds no error in the Bankruptcy Court's determinations on these issues and affirms its conclusions.

### D. *The Good Faith and Fairness of the Plan*

■ Confederation Life contends that the bankruptcy court erred in its determination that the debtor's plan was filed in good faith and was fair and equitable. Such determinations are reviewed under the clearly erroneous standard. *In re Saylors*, 869 F.2d 1434 (11th Cir.1989).

Confederation Life argues that the debtor proposed the plan to avoid immediate tax recapture, to speculate with the collateral in the hopes that it will appreciate and to enrich the general partners. These contentions were raised below and rejected in the bankruptcy court's October 4, 1990 order.

The court has reviewed the arguments, the record, and the relevant law. An eval-uation of the bankruptcy court's application of the factors enunciated for determining good faith in *In re Natural Land Corp.*, 825 F.2d 296 (11th Cir.1987) reveals no error on the part of the bankruptcy court.

Accordingly, the court finds no error in the bankruptcy court's determinations on these issues and affirm its conclusions.

### E. *The Classification of Creditors*

■ Confederation Life argues that Classes 7, 8, and 9 are improperly classified and not impaired and that the classification scheme under the plan was presented for the principal purpose of obtaining an impaired accepting class in order to cramdown Confederation Life.

These arguments were presented before the bankruptcy court. They were denied in the May 2, 1990 and October 4, 1990 orders. The bankruptcy court's determinations in these matters is reviewed under the clearly erroneous standard. *In re Commercial Western Finance Corp.*, 761 F.2d 1329 (9th Cir.1985).

While Confederation Life presents facts which may imply motive on the part of Beau Rivage to meet the technical requirements for § 1129(a)(10) cramdown, it has presented no evidence that the bankruptcy court was clearly erroneous in its determination that the classes in dispute were not impaired and separate classification was not warranted. Accordingly, the court finds no error in the Bankruptcy Court's determinations on theses issues and affirms its conclusions.

### III. CONCLUSION

Having found no reversible error in its findings of fact or conclusions of law, the decision of the bankruptcy court in this matter is AFFIRMED.

SO ORDERED.