**In the Matter of IPC ATLANTA LIMITED PARTNERSHIP, an Ohio limited partnership d/b/a Noble Oaks Apartments, Debtor.**

**Bankruptcy No. A91–63869.**

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

July 1, 1992.

Neil C. Gordon, Michael D. Pinsky, Macey, Wilensky, Cohen, Wittner & Kessler, Atlanta, Ga., for Federal Home Loan Mortg. Corp.

James D. Wilson, Walter, Haverfield, Buescher & Chockley, Cleveland, Ohio, and Robert K. Picker, Jr., Atlanta, Ga., for National City Bank.

Nicholas N. Sears, Frank W. DeBorde, Morris, Manning & Martin, Atlanta, Ga., for debtor.

## ORDER

W. HOMER DRAKE, Jr., Bankruptcy Judge.

This matter is before the Court on the Objections to Confirmation filed on November 7, 1991, and the Notice of Withdrawal of § 1111(b) Election and Supplemental Objections to Confirmation filed on January 28, 1992, by the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and additionally, the Objection to Confirmation filed on April 30, 1992, by National City Bank ("NCB"). This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157(b)(2)(L). The following constitutes the Court's Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### A. Background

The debtor in this case, IPC Atlanta Limited Partnership ("Debtor"), is an Ohio limited partnership which owns and operates a 118 unit apartment complex in Clayton County, Georgia known as Noble Oaks Apartments (the "Property"). Debtor has ten limited partners and two general partners, Richard B. Ferris and Joseph J. Slovenec. Debtor had purchased this property on November 4, 1988 for $2,516,683.05, and as part of the purchase price, assumed a loan from Freddie Mac. The nonrecourse loan, with a principal amount of $1,725,000, originally had a ten-year term, maturing on October 1, 1997, and required monthly payments of principal and interest of $16,-525.41, based on an interest rate of 11.075% per annum. In addition to the loan from Freddie Mac, NCB held a second-priority mortgage on the property to secure a $550,000 debt, which was obtained by the partnership to pay a portion of the purchase price. This debt is personally guaranteed by some of Debtor's partners. Debtor's partners have also contributed a substantial sum for the purchase and operation of the property. From November, 1988 through October, 1990, Debtor made payments to Freddie Mac out of cash generated by the Property and from funds borrowed from NCB by the limited partners. However, beginning in November, 1990, Debtor was unable to pay the full monthly payments to Freddie Mac. As a result, Freddie Mac accelerated the note and advertised the property for a foreclosure sale.

On February 28, 1991 Debtor filed a Chapter 11 petition in this Court. As of the filing date, the amount of Freddie Mac's claim against Debtor was $1,782,114. On April 16, 1991, this Court entered a Notice and Agreed Interim Order for Use of Cash Proceeds ("April 16, 1991 Order") allowing Debtor to use the cash proceeds and authorizing Debtor to pay Freddie Mac the net cash proceeds remaining after the payment of operating expenses. This Order expressly states that it is not to be construed as either a waiver or admission

by Debtor that adequate protection is necessary, nor that the procedures contained therein constitute adequate protection of Freddie Mac's claim. Freddie Mac has received approximately $86,795.96 since the filing of the petition pursuant to this Order. On July 1, 1991, Debtor filed a Proposed Plan of Reorganization, followed by a Pre–Confirmation Modification to Plan of Reorganization filed on December 4, 1991. Freddie Mac has objected to both the original plan, and the modifications to the plan. In addition, Freddie Mac has filed a withdrawal of its previously made § 1111(b) election. NCB has also filed an Objection of Confirmation.

B. The Plan

Debtor's Plan of Reorganization divides creditors into six classes. The first class consists solely of Freddie Mac's claim of $1,782,114. Two alternative treatments are provided for Freddie Mac's claim under the plan. Under Alternative A, which Freddie Mac may vote to accept or reject, Freddie Mac's note would be amended to a principal amount of $1,699,308.07, and the monthly payments on such note would be Debtor's net monthly income, up to $16,525.41. The note would have a maturity date of October 1, 2000 A.D., and would bear interest at the original contract rate of 11.075%, based on a 30–year amortization schedule commencing on September 21, 1987. The accrued but unpaid interest, late charges and other fees due under the senior note would be due at maturity, without interest. Alternative B, effective should Freddie Mac reject the plan, states that Freddie Mac would receive a $1,350,000 note.[1] The plan proposes to pay interest only for two years after the effective date of the plan, and payments thereafter would be based on a 30–year amortization schedule. There is an eight year call on the plan note. Interest would be paid at the "market rate," as determined by the

Court, which Debtor contends is 9.25%. All payments made during the pendency of the case pursuant to the April 16, 1991 Order would be applied to reduce Freddie Mac's secured claim. In addition, under Alternative B, should Freddie Mac not elect the application of § 1111(b), then any allowed unsecured claim would be treated as a Class Six claim, and would receive 3.33% of the amount of the claim, or approximately $14,000 on Freddie Mac's potential $432,000 unsecured deficiency claim.

Class Two of the plan consists of unsecured claims totalling approximately $60,000, which are to be paid approximately 50% of the value of their claims from funds contributed by Debtor's partners. Class Three consists solely of NCB,[2] which loses its lien and receives nothing under the plan. Class Four consists of Debtor's limited partners' claims of $1,200,000, who will receive nothing under the plan. Class Five consists of Debtor's equity security holders, who will be eliminated, except for those partners who commit to contribute their share of a $70,000 infusion, who will retain their interest. Of that $70,000, $20,000 will be used to pay administrative claims in full, $30,000 will go to the Class Two general unsecured creditors, and the remaining $20,000 will be used as a capital reserve for payment of debt service shortages, if any, or deferred maintenance on the property. Class Six, as stated, would consist solely of Freddie Mac's unsecured claim, should Freddie Mac not elect to be treated as fully secured pursuant to § 1111(b)(2).

On October 24, 1991, Freddie Mac elected to treat its entire claim as secured, pursuant to § 1111(b)(2) of the Code. Thereafter, on November 7, 1991, Freddie Mac voted to reject Debtor's plan, and filed the Objections to Confirmation now before the Court. On December 4, 1991, Debtor filed a Pre–Confirmation Modification to Plan.

---

1. As will be discussed, the original plan stated that the principal amount of the note under Alternative B would be $1,300,000. However, since this note was based on the stipulated value of the property, which is $1,350,000, this was obviously a typographical error in the plan.

Debtor corrected this error in its Pre–Confirmation Modification to Plan of Reorganization, filed on December 4, 1991.

2. This is the treatment of NCB's claim under the plan as modified on December 4, 1991.

The first modification, which corrected a typographical error in the original plan, stated that the principal amount of the Alternative B note would be $1,350,000, instead of $1,300,000 as stated in the plan. The second modification, also concerning Alternative B, consisted of adding a sentence to the plan. That section now states, with the added sentence in bold:

In the event the plan is not accepted by FHLMC [Freddie Mac], the allowed secured claim of FHLMC will be treated as follows. There shall be applied and credited against the principal amount of such Allowed Secured Claim all payments made pursuant to the Notice and Agreed Interim Order for Use of Cash Proceeds from the Petition Date to the Effective Date. The payments made pursuant to the Notice and Agreed Interim Order for Use of Cash Proceeds to be made hereunder shall be applied against post-confirmation debt service under the Alternative B Note.

Finally, the last modification made by Debtor deleted a sentence which purportedly allowed NCB's claim to remain secured by the Subordinated Security Agreements, which were in effect prior to the filing of the petition. Since NCB lost its lien anyway pursuant to § 506 of the Code, Debtor contends that this modification merely clarifies the treatment of NCB. After Debtor made these plan modifications, Freddie Mac filed a Notice of Withdrawal of its § 1111(b) election on January 28, 1992, contending that the modifications to Debtor's plan were material, and constituted a fundamental change in the treatment of Freddie Mac. Debtor has filed an objection to this withdrawal. Additionally, Freddie Mac has filed four supplemental objections to confirmation, purportedly in response to Debtor's plan modifications.

C. The Confirmation Hearings

Confirmation hearings were held on November 14, 1991, and concluded on January 15–16, 1992. At those hearings, several witnesses were called by both Debtor and Freddie Mac to evaluate the physical condition of the Property and the potential net income generated by the Property, which are critical factors in the objections made by Freddie Mac. This evidence indicated that although there are no major structural problems with the buildings on the Property, substantial deferred maintenance is necessary, including, but not limited to, roof repair, replacement of carpet and appliances, parking lot repairs, and other necessary maintenance and repairs. However, it is not surprising that the parties disagree on the extent and ultimate expense of the repairs necessary. One of the most glaring differences involves the roofs on the apartment buildings. Both Debtor and Freddie Mac agree that repairs must be done on the roofs of several buildings. However, Freddie Mac, based on the inspection and testimony of Vernon W. Arthur, a roofing expert, contends that the expense of this undertaking would be $94,552, which includes labor, new decking, the cost of hauling away used materials, and the removal and replacement of existing roofs on some of the buildings that had more than one roof. Additionally, Freddie Mac introduced the testimony of Russell K. Bradley, who testified, after inspecting "four or five" of the buildings, that the total amount necessary to cure deferred maintenance, including the necessary roof repairs, the replacement of carpet, vinyl, appliances, and other necessary items, would be in excess of two-hundred and forty thousand dollars. Freddie Mac also points to Debtor's own unit-by-unit inspection report, which states that 38 units have "poor" carpet, defined by the report as carpet that needs replacing at the expiration of the current lease, and 27 more units have "fair" carpet, which may have to be replaced at the expiration of the current lease. Additionally, wallpaper in 43 kitchens and 36 baths are reported as either "poor" or "fair." Similar numbers apply to drapes and vinyl flooring. The inspection also states that several appliances are either "bad," stripped, or missing in many units. Freddie Mac argues that this report shows that deferred maintenance necessary at the Property would be far in excess of the funds that will be generated by the Property or available under the plan, and Debtor could not possibly generate the in-

come necessary to pay normal operating expenses, make necessary maintenance and repairs, and pay the debt service as required by the plan.

Conversely, Debtor argues that the necessary work could be completed at a significantly lower cost than Freddie Mac's estimates. Debtor's general partner, Joseph Slovenec, testified that the partners had contributed over $1,000,000 for capital upgrades since they bought the Property, including replacing stucco, carpeting, and upgrading the landscaping. Debtor's roofing expert, Michael Konanec, testified that he had inspected every roof at the Property, including a walk-through of each building and the inspection of core samples of various roofs. Konanec found that nine buildings had two layers of roofing materials, eight had only one roof, and none of the buildings had three roofs, contradicting Freddie Mac's witnesses, who testified that several of the buildings had three roofs. Konanec further testified that the amount necessary to bring all the roofs up to a "solid and water tight condition" was slightly more than $35,000, which included replacing decking, some woodwork, and other necessary materials. A second expert testifying on Debtor's behalf substantially agreed with Konanec, and stated that his estimate was that it would cost about $31,000 to repair the roofs. Both Slovenec and a representative of the Lane Company, the management company that manages the Property, also testified that the carpets, rather than being replaced, may be stained or repaired, and that used appliances may be used in lieu of purchasing new ones, thereby reducing costs. Based on this evidence and testimony, Debtor contends, the deferred maintenance on the Property could be cured with much lower expense than Freddie Mac's estimates.

Of equal or greater significance for the purposes of this case is the income generated by the Property and the expenses of operating the Property, as the net income after expenses is how Debtor will make the required payments to Freddie Mac. As the Property is an apartment complex, the condition of the units and the general appearance of the Property, as discussed previously, is of the utmost importance, as those factors directly influence rental income. Both Debtor and Freddie Mac agree that the rental market in the area is very sluggish at this time, and that per-unit rental rates on the Property are not likely to increase in the foreseeable future. However, the record shows that the occupancy rate for the Property has increased in the several months prior to the confirmation hearings to between 95–98%, with an economic income of approximately 80%.[3] The Property generated income averaging approximately $40,400 per month in 1991, with expenses, excluding debt service, averaging approximately $27,700. Debtor proposes to reduce monthly expenses by about $3,400 per month by employing a water-saving device in all of the units. Debtor's projections for the years 1992 and 1993 indicate that Debtor would have approximately $41,850 per month in income and $27,000 in expenses for 1992, with a net cash flow of about $12,000 per month in 1992 and $14,000 in 1993. Although Freddie Mac contends that the Property may operate at a loss for several months after confirmation, Debtor does not agree, and argues that the additional capital infused by the partners pursuant to the plan would be sufficient to cover any small amount necessary to make the debt service on the Property if necessary. Additionally, by allocating post-petition payments made to Freddie Mac in accordance with the April 16, 1991 Order to the first interest payments due under the plan, Debtor would have additional capital with which to make necessary maintenance and repairs. These facts, Debtor argues, show that the income from the Property and the capital infused by the partners would be more than sufficient to pay the debt service to Freddie Mac. For the following reasons,

---

**3.** Economic income represents the percentage of rents actually received relative to the total rents possible if every unit were rented at the full market value. Factors which tend to make this number lower than the occupancy rate include rent concessions, employees living in units at no cost or a lower than market rate, and collection losses.

the Court agrees with Debtor, and will confirm its plan of reorganization.

The Court will first address Freddie Mac's Notice of Withdrawal of its § 1111(b)(2) election before considering the specific objections to confirmation.

## CONCLUSIONS OF LAW

### I. Freddie Mac's Withdrawal of its § 1111(b) Election

Federal Rule of Bankruptcy Procedure 3014 provides that an election under § 1111(b) [4] may be made "at any time prior to the conclusion of the hearing on the disclosure statement or within such later time as the court may fix." Additionally, the Advisory Committee Note to the Rule states, in pertinent part:

> Generally, it is important that the proponent of a plan ascertain the position of the secured creditor class before the plan is proposed .. Only if the plan is not confirmed may the class of secured creditors thereafter change its prior election.

Fed.R.Bankr.P. 3014 (Advisory Committee note). The rule and comment clearly indicate that once the election is made, Debtor and any other creditors should be allowed to rely upon the election, absent a material alteration in the plan. *In re Keller*, 47 B.R. 725, 728–30 (Bankr.N.D.Iowa 1985). Therefore, the first issue is whether the modifications made by Debtor are "material" modifications.

 The first modification is merely the correction of an error in the amount of the note to be given Freddie Mac under Alternative B. The amount of the note is to be consistent with the stipulated value of the Property, which is $1,350,000. Debtor's correction of this error is not a material modification in the plan, and is not grounds for allowing the withdrawal of Freddie Mac's election. Neither is the third modification, wherein Debtor clarified the treatment of NCB. The failure of Debtor to state in its original plan that NCB would lose its lien is not prejudicial since both parties knew or should have known that NCB, as a second-lienholder, would lose its lien by operation of law pursuant to § 506(d) of the Code by virtue of Freddie Mac's superior position. The second modification is the added sentence concerning the allocation of post-petition net proceeds paid to Freddie Mac pursuant to the April 16, 1991 Order. Prior to the modification, the plan stated that payments made to Freddie Mac would be applied to the principal amount of Freddie Mac's secured claim. The modification states that the payments will be allocated to the post-confirmation debt service, meaning Freddie Mac will not receive any payments for approximately eight months after the effective date of the plan. Although this modification does clarify the method of allocating the payments made to Freddie Mac, the Court does not think that the modification so affected Freddie Mac's treatment so as to allow Freddie Mac to withdraw its § 1111(b) election. "A material alteration of the Plan by the Debtor is tantamount to filing a different plan and if a material alteration is made it would be inequitable to not allow a creditor to fully evaluate the proposal and determine whether it wished

---

4. Section 1111(b) of the Code states:

(b)(1)(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has recourse, unless

(i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or

(ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.

(B) A class of claims may not elect application of paragraph (2) of this subsection if—

(i) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or

(ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.

(2) If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.

to elect treatment under § 1111(b)." *Keller*, 47 B.R. at 730. The modifications made by Debtor certainly could not be construed as tantamount to filing another plan, and in the opinion of this Court, are not "material" modifications. Therefore, Freddie Mac will not be allowed to withdraw its § 1111(b) election. As a result, the Court need not address Freddie Mac's supplemental objections to Debtor's plan.

■ Even if Debtor had made a material modification to its plan, it does not necessarily follow that Freddie Mac has an unlimited time period to withdraw its election. Freddie Mac filed its § 1111(b)(2) election on October 24, 1991, thereby electing to have its entire claim treated as secured. Debtor then filed its Pre–Confirmation Modification to Plan of Reorganization on December 4, 1991, which made the plan modifications discussed herein. The confirmation hearings on the plan, which began on November 14, 1991, were concluded on January 15–16, 1992. Freddie Mac filed its Notice of Withdrawal of § 1111(b) Election on January 28, 1992. Debtor argues that Freddie Mac has waived its right to withdraw its election, if any right existed, by waiting several weeks after receiving notice of Debtor's modifications and two weeks after the conclusion of the confirmation hearing to file the Notice of Withdrawal. As the rule and advisory comment make clear, the purpose of limiting a creditor's right to withdraw its election is to allow the proponent of a plan to rely on the election. Fed.R.Bank.P. 3014. This Court thinks that the same reasoning may apply to also limit a creditor's right to withdraw its election in a case such as the one *sub judice*, where the final confirmation hearing has been held and the Court has ordered final briefing on the confirmation issues, even though a material modification may have been made. Although the Court need not decide this issue, it agrees with Debtor that Freddie Mac's Notice of Withdrawal of § 1111(b) Election was not timely.

## II. FREDDIE MAC'S OBJECTIONS TO CONFIRMATION

### A. Is the Plan Fair and Equitable

In order for a plan to be confirmed over the objection of a dissenting class, the plan must be "fair and equitable." 11 U.S.C. § 1129(b)(1).[5] The Code provides certain

---

5. Section 1129, in pertinent part, reads as follows:

(a) The court shall confirm a plan only if all of the following requirements are met:

(1) The plan complies with the applicable provisions of this title.

(2) The proponent of the plan complies with the applicable provisions of this title.

(3) The plan has been proposed in good faith and not by any means forbidden by law.

. . . .

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or

(B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

. . . .

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

. . . .

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the

minimum requirements for confirmation, but the Court may decide that a plan is not fair and equitable and is therefore unconfirmable even if it is in technical compliance with these requirements. *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1352, *reh'g denied*, 889 F.2d 663 (5th Cir. 1989); *In re D & F Construction, Inc.*, 865 F.2d 673 (5th Cir.1989); *In re EFH Grove Tower Associates.*, 105 B.R. 310, 313 (Bankr.E.D.N.C.1989); *In re Simons*, 113 B.R. 942, 946 (Bankr.W.D.Tex.1990).

Freddie Mac first contends that the plan is not fair and equitable because the plan does not provide that Freddie Mac receive payments totalling at least the amount of the entire secured claim and with a present value equal to the value of the Property. In support of this, Freddie Mac argues that the inadequate capitalization of the Property, and the lack of available funds provided for in the plan, reduce the value of the reversionary interest in the Property. Thus, at the maturity date of the loan in the year 2000 A.D., Debtor will be unable to refinance or sell the Property for an amount equal to the amount due on the note, and thus, Freddie Mac would not be able to recover the value of its collateral. However, the Court disagrees with Freddie Mac's analysis. As stated, Freddie Mac's claim is to be treated as fully secured pursuant to its § 1111(b) election. The amount of such secured claim is $1,782,114, and the stipulated value of the property is $1,350,000. Therefore, Freddie Mac must receive payments which total $1,782,114 over the life of the plan and with a present value of $1,350,000. Debtor's plan provides, under Alternative B,

that Freddie Mac will receive a note in the principal amount of $1,350,000, with interest to be paid at the market rate, as determined by the Court. There can be no question that Freddie Mac is receiving the present value of the value of the collateral, or $1,350,000. *See In re Aztec Co.*, 107 B.R. 585, 587 (Bankr.M.D.Tenn.1989). Moreover, the total of the payments to Freddie Mac over the life of the plan more than equal Freddie Mac's total claim. The reversionary interest, which Freddie Mac contends will decline in value, the present and future condition and income of the Property, and any other factors which go to the risks involved in such a note, will be weighed by the Court in determining the proper cram-down interest rate to be applied to the Alternative B note. Thus, the Court finds that § 1129(b)(2)(A)(i)(II) has been satisfied, and Freddie Mac's objection as to that subsection is denied.

Freddie Mac also raises other arguments in support of its contention that the plan is not fair and equitable. Freddie Mac argues that the plan places all or substantially all of the risk of nonperformance on Freddie Mac. In support of this objection, it points out that the plan calls for the due date of Freddie Mac's loan to be extended for three years beyond the six years remaining on the original ten-year note, reamortizes the loan as if the effective date of the Plan were day one of the loan, and additionally, provides for interest-only payments for the first two years, which means that almost no principal will be paid before the maturity of the note. Freddie Mac also contends that Debtor's plan calls for insufficient recapitalization by the partners,

property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such

liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

(B) With respect to a class of unsecured claims—

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

which shifts substantially all of the risks to Freddie Mac, since the capital reserve proposed in the Plan is insufficient to make badly needed repairs and replacements necessary for the Property, which drastically reduces the appeal of the apartments, thereby making a default likely. In response, Debtor argues that the income that will be produced by the Property, and the reserves set aside from the partners' capital infusion, are more than sufficient to pay the debt service, as well as the necessary maintenance and repairs to the Property. Debtor also states that extending the maturity date of the loan does not shift all of the risk to Freddie Mac, since large capital contributions have been made by the partners since the purchase of the Property, and during the pendency of the case. Furthermore, Debtor points out that Freddie Mac will receive a market rate of interest on its loan, and should Debtor default, Freddie Mac could foreclose on the Property. Thus, Debtor argues, Freddie Mac is well protected, and is receiving fair and equitable treatment under the plan, especially since the alternative is for Freddie Mac to foreclose now and leave the other creditors with nothing.

While it is true that the extension of the repayment period and beginning the amortization period as if it were the first day of the loan means that Freddie Mac will be paid little principal before the maturity date in October, 2000 A.D., this treatment is not unfair or inequitable in this case. Freddie Mac will be receiving a market rate of interest, as determined by the Court in this Order, to assure that it will receive the present value of its claim. The interest rate to be applied to the Alternative B note will reflect the risk assumed by Freddie Mac. If the debt service payments are not made as required, Freddie Mac will then have the option of foreclosing on the Property. Moreover, as will be discussed in detail, the Court thinks that Debtor has produced sufficient evidence that the necessary maintenance and repairs on the Property can be made with funds available under the plan, and generated by the Property. As stated, the plan provides for the partners to infuse $70,000, of which $20,-

000 is to be used as a capital reserve for payment of debt service shortages, if any, or deferred maintenance on the property. In addition, Debtor's plan provides that no payments will be made to Freddie Mac until approximately eight months after the effective date of the plan, which conceivably will provide Debtor with sufficient funds with which to make the necessary maintenance and repairs. Therefore, the Court holds that the plan is fair and equitable to Freddie Mac, both as to the technical requirements of § 1129(b)(2) and otherwise.

**B. The Cram–Down Interest Rate**

■ Because the rate of interest to be applied to the note pursuant to § 1129(b)(2) is an integral part of this case including the Debtor's ability to fund the plan, the Court will now determine the proper interest rate. Generally, to calculate present value, "the appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved." 5 *Collier on Bankruptcy*, ¶ 1129.03[4][F] (15th ed. 1989). Courts that have addressed the issue have applied "every measure of interest rate from that set forth in the original contract between the parties . . ., to the legal rate of interest . . ., to the market rate of interest." *Confederation Life Ins. Co. v. Beau Rivage, Ltd.*, 126 B.R. 632, 637 (N.D.Ga.1991) (citations omitted). Rather than applying a blanket rule, however, most courts generally address the issue on a case-by-case basis. *In re Patel*, 21 B.R. 101, 105 (Bankr.M.D.Fla. 1982). "The purpose of the present value requirement is to place the holder of an allowed secured claim in the same position economically as if the debtor exercised the option of surrendering the collateral." *In re Corley*, 83 B.R. 848, 850 (Bankr.S.D.Ga. 1988).

Debtor contends that the proper "market" rate of interest that should be applied is 9.25%, which is the current risk-free rate of 6.78%, as determined by looking to United States Treasury Bonds having Novem-

ber, 2000, A.D. maturity date,[6] plus 2.47%, which incorporates the lender's risk and profit. Conversely, Freddie Mac argues that the proper interest rate of 12.375% should apply to the note. This rate was reached by taking the risk free rate of 6.78%, and then adding a margin of 3% which incorporates the lender's profit as well as a standard risk associated with real estate loans. Then to that sum, Freddie Mac added an additional 2.6%, which is based on the particular risk involved in making that particular loan. As stated, the original contract rate of interest was 11.-075%. The difference between the proposed rates are significant, since Debtor's own projections show that Debtor would be unable to meet its obligations under the new note if Freddie Mac's interest rate was adopted.

For purposes of determining the proper cram-down interest rate, the Court will adopt the method and reasoning set forth by Judge Bihary in *In re Oaks Partners, Ltd.*, 135 B.R. 440 (Bankr.N.D.Ga.1991). This approach, referred to as either the "time value of money approach" or the "formula approach" is determined by first taking the appropriate risk-free rate, and adding to that base rate an additional amount of interest to take into account the risks associated with the debtor, the security, and the plan. 135 B.R. at 446; *see also In re Fowler*, 903 F.2d 694 (9th Cir.1990); *U.S. v. Doud*, 869 F.2d 1144, 1145 (8th Cir.1989); *In re Computer Optics, Inc.*, 126 B.R. 664, 672 (Bankr.D.N.H.1991); *Aztec Co.*, 107 B.R. at 588. The appropriate risk-free base rate is determined by looking to the yield on a treasury note which matures at approximately the same date as the note, which in this case is October, 2000 A.D. The published yield as of the date of this Order on a treasury bond maturing in November, 2000, A.D. is 8.5%. To this, the Court will analyze the risks involved in this particular case. *Oaks Partners*, 135 B.R. at 446.

Both parties introduced the testimony of interest rate experts during the confirmation hearing. Freddie Mac's expert contends that the Court should first add a margin representing the "standard risk" involved in making a real estate loan to the base rate.[7] Then, to this, Freddie Mac would also add an additional amount representing the "particular risk" of this particular loan. The Court thinks that this analysis is misplaced. The additional interest rate added to the base rate includes all of the risks assumed by the lender, whether they are labeled as "standard risks" or "risks particular to that loan." Although Freddie Mac or other lenders may analyze such loans in this way, this Court will not undertake such an analysis.

Although there can be no doubt that the Property is in need of maintenance and repairs, especially the roofs, carpets, and appliances, Debtor has presented sufficient evidence that the necessary work could be accomplished at a reasonable expense, thereby making the Property attractive to both present and potential tenants, and maintaining the value of the Property over the life of the note. Moreover, the evidence shows that the current management is competent, and in fact, has raised the occupancy rate to 95–98%. Debtor has also provided projections which appear reasonable, indicating that it will have sufficient net income to fund the plan.

However, the past history of the Property and the current sluggish rental market do suggest that there is a risk involved. In addition to the aforementioned deferred maintenance, Debtor can expect additional repairs and maintenance associated with a twenty-year old property. Therefore, the rate of interest that will be added to the base rate is 3%. If Debtor's net income projections turn out to be close to the actual net income received, Debtor will be able to make the necessary monthly payments on the note. If it develops that Debtor cannot meet this obligation, Freddie Mac will have the option of foreclosure. There-

---

6. The information supplied by Debtor was the rate for United States Treasury Bonds as of the date of briefing. That is not necessarily the current rate, as of the date of this Order.

7. It is this step which Freddie Mac argues was omitted in *Oaks Partners*.

fore, if the plan were confirmed today, the appropriate cram-down interest rate would be 11.5%, which is the risk-free rate of 8.5%, plus a risk component of 3%. *See Oaks Partners*, 135 B.R. at 447 (treasury note rate plus 3% risk component); *Computer Optics*, 126 B.R. at 672 (cram-down rate was 4% over treasury note and 2% over prime rate); *In re Koch*, 131 B.R. 128 (Bankr.N.D.Iowa 1991) (rate was 2% over treasury note). The Court notes that this rate is slightly above the original contract rate of 11.075%. Because of risk factors associated with the Property, which may not have been present when the original contract was negotiated, the slightly higher rate is warranted in this case.

### C. Allocation of Post–Petition Payments to Freddie Mac

■ Freddie Mac objects to Debtor's plan insofar as it applies post-petition net income paid to Freddie Mac pursuant to the April 16, 1991 Order to be allocated to the first eight payments due Freddie Mac under the plan. Freddie Mac argues that these payments should be considered adequate protection payments, and should not be used to reduce the amount of Freddie Mac's secured claim. The rational behind this argument is that since Freddie Mac has a perfected security interest in both the Property and in Debtor's rents and proceeds, and because the rents are being used by Debtor, part of Freddie Mac's collateral is being diminished, thus making adequate protection necessary. Alternatively, Freddie Mac contends that Debtor, in the April 16, 1991 Order, in effect agreed to make adequate protection payments to Freddie Mac to avoid Freddie Mac's threat of going forward with its Motion for Adequate Protection. For the following reasons, the Court disagrees with Freddie Mac's arguments.

In *United Savings Assoc. v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), under facts very similar to the case now before the Court, the United States Supreme Court held that an undersecured creditor is not entitled to adequate protection on its collateral from the filing of the petition under § 362(d)(1). *See also Beau Rivage*, 126 B.R. at 639; *In re Club Assoc.*, 107 B.R. 385, 394 (Bankr.N.D.Ga.1989); *Oaks Partners*, 135 B.R. at 449. However, Freddie Mac contends that since it also has a valid perfected security interest in Debtor's rents and proceeds, this constitutes a separate class of collateral which is entitled to adequate protection, and since Debtor has been using the rents during the pendency of the case, that collateral is being eroded. As a result, Freddie Mac contends that it is entitled to adequate protection for that erosion.

This Court has previously held that where the value of the collateral does not depreciate, the creditor is not entitled to adequate protection payments, notwithstanding the fact that the creditor also had a perfected security interest in the debtor's rents and proceeds, which were being used by the debtor during the pendency of the bankruptcy case. *In re Beau Rivage Ltd.*, Case No. A89–13866 (Bankr.N.D.Ga.1990, October 3, 1990), *aff'd*, 126 B.R. 632 (N.D.Ga.1991). In *Beau Rivage*, this Court found that the rents were used by the debtor to *increase* the value of the collateral after the filing of the petition, thereby shifting value from one source of collateral, the rents, to another source, the real property. *Id.*, slip op. at 7; *Beau Rivage*, 126 B.R. at 639. This Court thus distinguished *In re Flagler–At–First Assoc., Ltd.*, 114 B.R. 297 (Bankr.S.D.Fla.1990), cited by the creditor in that case and by Freddie Mac in this case, wherein the court held that an undersecured creditor was entitled to adequate protection for the erosion of post-petition rents and revenues.[8] *See*

---

**8.** The court in *Flagler* reasoned that had the court not allowed the debtor, the owner of an office building, to use the rents in the operation of the building, they would have been segregated as a separate collateral, and therefore, added to the value of the creditor's secured claim. 114

B.R. at 302. The court then held that since the creditor would have been entitled to the rents anyway, the payments made to the creditor post-petition constituted a "wash", and no further reduction of the claim was appropriate. *Id.*

*also In re Landing Assoc., Ltd.*, 122 B.R. 288 (Bankr.W.D.Tex.1990). *Beau Rivage* did not address the present situation, where the value of the property serving as collateral is presumed to remain constant. However, the same result must be reached in the case *sub judice.*

In *Oaks Partners,* Judge Bihary, in discussing the identical issue this Court is faced with, wrote that "[f]irst and foremost, a creditor is not entitled to be paid more than its claim, regardless of what kind of collateral secures the claim." 135 B.R. at 449. In this case, Freddie Mac has a claim for $1,782,114. Freddie Mac's argument that it should be able to keep the post-petition payments without crediting the amount received to the claim would allow Freddie Mac, an undersecured creditor, to receive the entire amount of its claim pursuant to the terms of the plan, and in addition, the post-petition payments paid by Debtor. Thus, Freddie Mac would be receiving more than its claim. *Id.* This, in effect, would allow Freddie Mac to receive interest payments or use value, in direct contravention of *Timbers* and § 506(b) of the Code. *In re Reddington/Sunarrow Ltd. Partnership,* 119 B.R. 809, 813 (Bankr.D.N.M.1990); *Beau Rivage,* 126 B.R. at 640. Second, if the value of the post-petition rents received by Debtor were included in the value of Freddie Mac's secured claim, the amount of that claim would continue to grow during the pendency of the case and the automatic stay. This also could not have been the intended result of the Supreme Court in *Timbers. Oaks Partners,* 135 B.R. at 450; *Timbers,* 484 U.S. at 371–72, 108 S.Ct. at 630. Therefore, this Court holds that the post-petition payments made to Freddie Mac pursuant to the April 16, 1991 Order must be credited to Freddie Mac's secured claim. To the extent that *Flagler* may be interpreted to allow an undersecured creditor to receive post-petition payments without having to apply them to the secured claim, solely because the creditor has a separate security interest in the debtor's rents, this Court respectfully disagrees. *See Also Oaks Partners,* 135 B.R. at 451; *Reddington/Sunarrow Ltd. Partnership,*

119 B.R. at 813. The amounts paid to Freddie Mac post-petition may be allocated to the first monthly payments due under the plan. *Beau Rivage,* slip op. at 5, 126 B.R. at 640–41; *Oaks Partners,* 135 B.R. at 451; *In re Sherwood Square Associates,* 87 B.R. 388 (Bankr.D.Md.1988).

Freddie Mac's second argument against the application of the post-petition payments to its secured claim is that Debtor's consent to the April 16, 1991 Order meant that the payments, in effect, were adequate protection payments. This argument is without merit. The April 16, 1991 Order clearly states that "[n]othing in this Order shall be construed to constitute a waiver or admission by the Debtor that adequate protection is necessary ... nor an admission by [Freddie Mac] that the procedures specified herein above constitute adequate protection ..." Whether Debtor consented to this Order to avoid a hearing on the adequate protection issue is not relevant at this point. Therefore, the Court finds that Debtor made no admission concerning the necessity of adequate protection by consenting to the April 16, 1991 Order.

### D. Feasibility

Freddie Mac's second objection to the plan is that it is not feasible, as required by § 1129(a)(11) of the Code. In support, Freddie Mac reiterates its contentions that the stated recapitalization of $70,000 is inadequate to make the necessary repairs and maintenance on the property, and that the reserves and income from the property are inadequate to meet the debt service, thus making liquidation or further reorganization likely. A plan may not be confirmed if confirmation is likely to be followed by liquidation or further reorganization of the debtor. 11 U.S.C. § 1129(a)(11). There is certainly no guarantee of a successful reorganization in this case, but the Bankruptcy Code does not require such a guarantee. *Kane v. Johns–Manville Corp.,* 843 F.2d 636, 649 (2nd Cir.1988); *In re E.I. Parks No. 1 Ltd. Partnership,* 122 B.R. 549, 558 (Bankr. W.D.Ark.1990); *In re 222 Liberty Associ-*

*ates,* 108 B.R. 971, 985 (Bankr.E.D.Pa. 1990). However, the Court will look to see whether the Debtor can realistically carry out the provisions of the plan, and whether the plan offers a reasonable prospect of success. *In re Lakeside Global II, Ltd.,* 116 B.R. 499, 506 (Bankr.S.D.Tex.1989). Factors to be considered in making this determination include the adequacy of the capital structure, the earning power of the business, economic conditions, the ability of management, the probability of the continuation of the same management, and any other matters which may affect feasibility. 5 *Collier on Bankruptcy,* ¶ 1129.02[11] (15th ed. 1989) (citing *In re Landmark at Plaza Park, Ltd.,* 7 B.R. 653, 659 (Bankr. D.N.J.1980)); *see also E.I. Parks No. 1 Ltd. Partnership,* 122 B.R. at 559; *Lakeside Global II, Ltd.,* 116 B.R. at 506; *222 Liberty Associates,* 108 B.R. at 986.

The Court thinks that the plan is feasible. The present management has succeeded in raising the occupancy rate of the Property to approximately 95–98% since they were hired by the partners. Moreover, the future income projections introduced by Debtor, although viewed with scrutiny, indicate that Debtor will be able to make the debt service payments of approximately $12,937 per month from its net income. Moreover, the allocation of payments made to Freddie Mac under the April 16, 1991 Order to the first monthly payments due under the plan and additional capital contributed by the partners may be used to make necessary maintenance and repairs, making the Property more attractive and valuable. Although the Court agrees with Freddie Mac that the current capital structure could stand improvement, this does not change the Court's opinion. Therefore, Freddie Mac's objection as to the feasibility of the plan is denied.

### E. Freddie Mac's Opportunity to Vote on the Plan

Freddie Mac next contends that the plan does not comply with § 1129(a)(1) and

§ 1126, which states that "the holder of a claim or interest allowed under section 502 of this title may accept or reject a plan" because Freddie Mac was not allowed to vote on the two alternate treatments provided by the plan: Alternative A and Alternative B. However, this objection may be quickly dismissed. Alternative A is the proposed treatment of Freddie Mac's claim under the plan. Freddie Mac was given the opportunity to vote on this alternative, and did in fact reject this treatment. Alternative B, as clearly indicated in the plan, is merely the proposed treatment of Freddie Mac under the cram-down provisions of § 1129(b). Since Freddie Mac had the opportunity to vote, and in fact did vote on the plan, this objection is denied.

### F. Was the Plan Proposed in Good Faith

Freddie Mac's final objection to the plan is that the plan was not proposed in good faith, as required by § 1129(a)(3),[9] because payments were made to NCB, whose loan was guaranteed by Debtor's partners, within one year of the filing of the petition while the loan to Freddie Mac was in default. Freddie Mac further argues that payments made to NCB, totalling over $400,000, were preferential transfers, and that Debtor has refused to recover those sums on behalf of the estate. However, Freddie Mac has produced no evidence to contradict Debtor's contention that it was the limited partners who paid NCB and that the funds did not come from property of the estate. Therefore, this objection is denied.

### II. NCB'S OBJECTIONS TO CONFIRMATION

NCB, in its Objection to Confirmation filed on April 30, 1992, contends that the plan, as modified, has the effect of releasing Debtor's partners from their personal guaranties of the loan from NCB or

---

**9.** Freddie Mac originally argued that the plan treated NCB as unimpaired, and called for the curing and reinstatement of NCB's lien. However, because Debtor's modifications made on

December 4, 1991 corrected these plan provisions, this issue is moot. NCB's lien is extinguished pursuant to § 506 of the Code.

curing the acceleration imposed on the obligation as a result of the bankruptcy. The Court does not agree that the plan has that effect, and will deny NCB's Objection. However, to the extent that it may be interpreted in that way, the Court will clarify the treatment of NCB.

Under the plan, NCB is classified as a subordinated lender, and provisions are made for the release of its security interest in the real property of Debtor. Nothing in the plan, however, is to be construed as effecting any release upon those individuals who have issued personal guaranties to NCB in connection with the monies furnished to Debtor by NCB on credit terms pursuant to what is referred to in the plan as the "Subordinated Note." Such personal guaranties shall remain in full force and effect according to their terms. Events set forth in the Subordinated Note as triggering acceleration of the underlying debt shall not be deemed cured by this plan visa-vis the personal guarantors of the Subordinated Note. Nothing in the plan shall be construed as a barrier to, or defense by, the personal guarantors to any demand or action by NCB to enforce the personal guaranties according to the express terms of the subordinated note. NCB shall not be estopped from making any demand against the personal guarantors at any time under the terms of the note.

### III. CONCLUSION

Debtor's Plan of Reorganization meets the requirements of § 1129, and is therefore confirmable. Accordingly, the Objections to Confirmation filed by Freddie Mac and National City Bank are hereby DENIED. It is FURTHER ORDERED that Freddie Mac's Notice of Withdrawal of § 1111(b) Election is DENIED.

IT IS SO ORDERED.